**SPECTROFUGE CORPORATION, a Florida Corporation, Plaintiff-Appellee Cross Appellant,**

v.

**BECKMAN INSTRUMENTS, INC., a California Corporation, Defendant-Appellant Cross Appellee,**

v.

**Reinaldo del VALLE and William David Dawson, Counterdefendants-Appellees.**

No. 75–2016.

United States Court of Appeals, Fifth Circuit.

June 16, 1978.

Sheldon Karon and Richard L. Horn, Chicago, Ill., Robert J. Steinmeyer, Fullerton, Cal., for Beckman Instruments, Inc.

Kenny, Nachwalter & Seymour, P.A., Michael Nachwalter, of counsel, Kelly, Black, Black, Wright & Earle, P.A., Hugo L. Black, Jr., of counsel, Miami, Fla., for Spectrofuge Corp.

Before BROWN, Chief Judge, AINSWORTH, Circuit Judge, and JAMESON *, District Judge.

JOHN R. BROWN, Chief Judge:

This antitrust case presents, among others, an interesting relevant market problem.

Spectrofuge Corporation, an independent service organization, brought suit against Beckman Instruments, Inc., a manufacturer of scientific instruments, alleging that Beckman had restrained trade and had monopolized or attempted to monopolize the servicing of its instruments, one in particu-

* Senior District Judge from the State of Montana, sitting by designation.

lar, in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. It also charged Beckman with common law unfair competition. Beckman, counterclaiming for violation of § 1 and for unfair competition, alleged that Spectrofuge had pirated its employees and misappropriated its confidential information. After a two-week trial, the jury returned a general verdict[**] in favor of Spectrofuge on its claims and against Beckman on its counterclaims.

After the trial court entered judgment on the verdict, Beckman moved for judgment n.o.v. or, in the alternative, for a new trial. The Trial Judge ordered a "remittitur" of a portion of the damages awarded Spectrofuge but otherwise denied Beckman's motion. Spectrofuge unsuccessfully moved for a permanent injunction. It subsequently moved to modify the judgment with respect to the award of attorneys' fees and the denial of injunctive relief. These motions were denied. All are unhappy and both parties appeal.

We reverse the judgment entered for Spectrofuge on its antitrust claims and the attorneys' fee award. The judgment on the common law count is affirmed. This result disposes of the issues raised on Spectrofuge's cross-appeal.

We have mapped out the following course for explaining our Monopoly game. With our first roll of the dice, we introduce the players. Second, we detail, to the extent necessary, the players' conduct which formed the bases of the complaint and counterclaim. Third, after discussing the verdict, final judgment, and issues raised on appeal, we reach the Sherman Act claims. Finally—without passing Go or collecting $200—we take care of odds and ends.

## I. Background

### Beckman

Beckman is a California corporation engaged, among other things, in the manufacture and sale throughout the United States of a wide variety of scientific instruments and accessories, including, for example, liquid scintillation counters, amino acid analyzers, spectrophotometers, and ultracentrifuges. Of particular importance here are Beckman's ultracentrifuges (UCs) which analyze samples of various materials. The instrument spins the sample at high rates of speed (60,000 to 70,000 rpm) until the material separates into its various components. Its applications in the biomedical field are many. For instance, the UC played a major role in the development of flu and polio vaccines due to its ability to purify flu and polio viruses.[1]

[**] Because of his demonstrated interest in special verdicts under F.R.Civ.P. 49(a), the Chief Judge offers these comments:

Alas, alack,
General verdicts are back,
And in antitrust where they burden us greater!

Why do they ignore the Doubt Eliminator? See J. Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 338 (1967); *Wolfe v. Virusky*, 5 Cir., 1972, 470 F.2d 831, 837 (Brown, C. J., concurring); *In re Double D. Dredging Co.*, 5 Cir., 1972, 467 F.2d 468, 469 n. 3; *Thrash v. O'Donnell*, 5 Cir., 1971, 448 F.2d 886, 889–92; *Little v. Bankers Life & Casualty Co.*, 5 Cir., 1970, 426 F.2d 509, 512 (Brown, C. J., concurring); *Horne v. Georgia So. & Fla. Ry.*, 5 Cir., 1970, 421 F.2d 975, 980 (Brown, C. J., concurring); *Pinder v. Hudgins Fish Co.*, 5 Cir., 1978, 570 F.2d 1209, 1210 n. 1.

1. There are two types of UCs, analytical and preparative. The difference between them lies in the fact that the analytical UC contans a series of optical systems which enable viewing of the ongoing process.

During operation, the UC develops a force of about one-half million times the force of gravity. Its operative parts include vacuum and refrigeration systems, an electrical drive unit which spins the rotor, and elaborate electronic circuitry to control the rotor's speed. The aluminum or titanium rotor, into which tubes holding the sample are inserted, is enclosed within a chamber defined by a steel barrier over two inches thick and is machined to very close specifications to enable its rotation at ultrahigh speeds. The UC's outer appearance is somewhat similar to a photocopying machine—without the collator.

There are at least two potential dangers arising from operation of the UC. Rotor explosions can cause injury to anything or anyone in its wake. The second occurs when hazardous samples being analyzed escape into the atmosphere and contaminate the surrounding area. Thus, proper UC servicing is critical to ensure safe operation.

Beckman manufactures its products through four unincorporated producing divisions. The Spinco Division manufactures the UC. The other three are the Scientific Instruments (SID), Clinical Instruments (CID), and Electronic Instruments (EID) Divisions. The Analytical Instrument Sales and Service Division (AISSD) performs the sales and servicing functions for the four producing divisions.

Incidental to the sale of its instruments, Beckman provides servicing and maintenance free during the one-year warranty period. Thereafter, service is provided on a contract[2] or a call-by-call basis by approximately 275 Beckman field service representatives stationed throughout the United States. These representatives receive formal training courses conducted by Beckman in California and on-the-job training in the field when they first join the company.

Each representative carries a personal inventory of replacement and exchange[3] parts for Beckman instruments which is valued at about $5,000 per man. This private stock is referred to as "service inventory." Additional service inventory is carried at depots, district offices, a central warehouse in Fullerton, California, and at the producing divisions. This inventory is available exclusively for the use of service representatives.[4] Beckman also maintains a "sales inventory" of parts—available for sale to instrument owners, independent service organizations, etc.—located at depots

and at the producing divisions. Inventory control is monitored by computer.

*Spectrofuge*

Two Beckman service representatives, Reinaldo del Valle and William Dawson, resigned their jobs and, in May 1972, formed Spectrofuge Corporation.[5] Dawson, its first president, subsequently sold his stock to del Valle who then became president and sole stockholder. During Dawson's tenure with Beckman, he had repaired and serviced pH meters, spectrophotometers, liquid scintillation counters, gas chromatographs, and UCs; del Valle[6] had serviced amino acid analyzers and UCs.

One of Spectrofuge's goals, as stated in a promotional letter, was:

. . . to provide local service at lower rates than major companies. This is accomplished by limiting the service specialist to a thirty mile radius of operation in his assigned location. This cuts cost involved in traveling and permits faster service, since the specialist is not over-extended or out of town when needed.[7]

Another such letter[8] outlines in the first paragraph the services offered:

Spectrofuge Corporation provides maintenance contracts and reimbursable repair service for laboratory and industrial instruments. We have grown rapidly as a result of efficient service of consistently high quality at a competitive price. Our personnel average twelve years of

---

**2.** Some Beckman contracts provide service without free parts; others are total service agreements under which the customer receives preventive maintenance, emergency service, and all parts for a fixed fee during the contract period.

**3.** An "exchange" part is one which the customer returns to Beckman who first determines whether the part is repairable. If it is, Beckman repairs and then sells it at a price lower than that for a brand new equivalent. The drive for the UC is one example of an exchange part.

Replacement parts are new. Beckman's replacement parts inventory is valued at about $2 million. It costs AISSD over $.5 million annually to maintain its inventory which covers physical depot space, freight, computer control

system, and payroll for shipping clerks and inventory control personnel.

**4.** Beckman's policy is not to fill sales orders from service inventory because depletion of the latter could result in the unavailability of parts when needed by service representatives to perform Beckman contracts.

**5.** Beckman's employment contract with its service representatives did not include an agreement not to compete.

**6.** Prior to joining Beckman, del Valle was employed as a service engineer for Cary Instruments.

**7.** DX 45.

**8.** PX 260.

experience per man and are qualified to work on almost all types of instruments. Analytical and preparative ultracentrifuges, liquid scintillation counters, amino acid analyzers, and spectrophotometers are our major business. Hence the name *Spectrofuge*.[9]

Del Valle lived in Miami, Dawson in Gainesville. Their initial efforts to obtain service contracts [10] focused on institutions owning instruments which they had serviced as Beckman—and in del Valle's case, Cary—employees; e. g., the University of Miami and the University of Florida. According to del Valle, in order to expand business, it was necessary for Spectrofuge to hire qualified service people.[11] On September 30, 1972, Larry Autry, a Beckman service representative stationed in North Carolina,[12] resigned and joined Spectrofuge on October 1. Autry began to service for Spectrofuge some of the same institutions which he had previously serviced while working for Beckman.[13]

In early 1973 Spectrofuge submitted a bid to Union Carbide at Oak Ridge, Tennessee, covering service of Beckman UCs, amino acid analyzers, sequencers, and recording spectrophotometers for the period April 1, 1973 to March 31, 1974. Beckman, who then held a service contract on its instruments at Union Carbide, rebid for the new year. In October or November 1972, when Spectrofuge was contemplating the bid submission, George Farnham, the Beckman representative stationed in Tennessee who serviced Beckman's instruments at Carbide, agreed to join Spectrofuge if its bid was accepted. Sometime thereafter Farnham so informed Beckman. In March 1973 when the contract was awarded to Spectrofuge, Beckman fired Farnham who immediately became a Spectrofuge employee servicing Beckman equipment at the Oak Ridge facility.[14]

9. The remainder of this letter (PX 260) reads as follows:

Our experience includes service contracts with laboratories at major Universities and Hospitals in Florida, North Carolina, Tennessee, and Maryland. We have experimented with the concept of providing University-wide coverage on all instruments, and this arrangement has proven advantageous to all parties at great savings to each laboratory. We also have service contracts with Union Carbide (Nuclear Division), The Florida Power and Light Company, Dade Division of American Hospital, Inc., Coulter Diagnostics, Inc., the United States Department of Agriculture (Florida), and the Environmental Protection Agency (Florida and North Carolina). We provide similar services to the government of the Grand Bahamas, and we have excellent prospects in negotiation with the government of Ecuador.

Special services are available through our divisions of *Custom Design and Research and Development*, headed respectively by a professional electronics engineer (B.S.E.E., M.S.E.E.) and a research biochemist (Ph.D.). Emphasis in these divisions is in spectrophotometer design, amino acid analysis, and in instruments having digital display and automatic computation of data. We plan to produce our own lines of instruments in the near future, and have already sold certain of our designs to respected instrument manufacturers.

We will expand our services into new cities as highly capable personnel become available to us. We will not offer service in a region

where we can not provide truly superior quality. We are proud of the satisfaction voiced by our past customers, and we invite you to examine further our qualifications and service record. Thank you for allowing us to introduce ourselves to you.

10. Spectrofuge limited its servicing of Beckman instruments to those which had been marketed before the departure of Dawson and del Valle since they were unable to keep abreast of Beckman's new technology.

11. See also the last paragraph of PX 260, quoted in note 9, *supra*.

12. Although located in North Carolina, Autry also worked on instruments for Beckman in South Carolina, Georgia, Tennessee, Alabama, and Florida.

13. The major institutions in North Carolina which owned many scientific instruments were the University of North Carolina, North Carolina State, Duke University, the VA Hospital in Durham, and two government facilities, the National Institute of Health (NIH) and the Environmental Protection Agency (EPA) located in Research Triangle Park (Chapel Hill, Raleigh, and Durham forming the "triangle").

14. The Union Carbide contract, PX 270, included a few instruments located in places other than Oak Ridge, namely, Duke University and Union Carbide in Rockville, Maryland. See note 48 and accompanying text, *infra*.

On June 13, 1973, Jose Sacerio, who had been the supervisor of the Electronics Section of the Medical Instrumentation Laboratory, joined Spectrofuge. Sacerio was hired for the purpose of servicing Packard liquid scintillation counters and designing instruments. Sacerio became Spectrofuge's Vice President for Custom Design and devoted about 45% of his time to design work. He spent the remainder on servicing instruments, spectrophotometers and UCs, although he performed only routine service on the latter. Sacerio never traveled outside Florida to service instruments and "probably" would have objected to moving. He left Spectrofuge on July 8, 1974.

The next employee acquired by Spectrofuge (in July 1973) was John Jackson who had been employed by Beckman as a service representative in the Research Triangle area.[15] Over 95% of his work for Spectrofuge was devoted to servicing Beckman UCs. Jackson worked for Spectrofuge for about one year. In August 1973 Spectrofuge hired a "jack of all trades" named Gonzales who, according to Sacerio, helped with brute force work, such as lifting instruments, and ran various errands. Gonzales was located in Florida. He left Spectrofuge in November 1973.

Del Valle and Dawson approached others to work for Spectrofuge[16] with a view toward increasing service capability: and gaining new contracts. These efforts to expand are succinctly summarized in chart form.

| Person solicited[17] | Location | At time of solicitation employed by | Service capability needed |
|---|---|---|---|
| Follis | Dallas-Houston | Beckman | Equipment at Baylor Univ., Univ. of Texas, Anderson Complex, all in Houston [18] |
| Kincheloe | N.C. | Beckman | Packard liquid scintillation counter work at Univ. of Miami; Univ. of N.C. total service contract |
| Bussel | Tenn. | Beckman | Packard liquid scintillation counter work at Univ. of Miami; Cary equipment at Union Carbide, Oak Ridge, Tenn. |
| Monday | Knoxville | Beckman | Oak Ridge contract; Vanderbilt Univ. work |
| Cheevy | unknown | Beckman | Vanderbilt Univ. work |
| Wallace | unknown | Packard | Packard liquid scintillation counter work |
| Drake | Ala. | Univ. of Ala. | Equipment at Univ. of Ala. [19] |

None of these persons ever signed on with Spectrofuge.

---

15. See note 13, *supra*.

16. Their approaches were limited to those whom they knew personally. Spectrofuge never placed "help wanted" ads.

17. We are unsure of the correct spelling of the names in this column. They are spelled in different ways in the trial transcript which was not corrected for appeal purposes except with respect to plaintiff's closing argument.

18. See notes 36 and 65 and accompanying text, and note 41, *infra*.

19. See notes 37 and 65 and accompanying text, and notes 41 and 88, *infra*.

## II. A Centrifugal Honeymoon: Beginning And End

From its beginning in May 1972, Spectrofuge went into direct competition with Beckman for service contracts on Beckman instruments as to which the one-year warranty period had expired. By offering service at a price between 15–20% below Beckman's, Spectrofuge was initially successful in each instance when the two companies were in direct bidding competition. Thus, Spectrofuge's growth was rapid. In its first fiscal year ending April 30, 1973, its sales totaled $49,942.68, with net income before taxes of $4,919.75 for a net profit of 9.9%. Its second year in business produced $135,619.19 in total sales, representing a 171% increase in sales volume. After deducting approximately $20,000 in legal expenses incurred in the prosecution of the present suit,[20] Spectrofuge's net profit for the second year was 20.5%

The early relationship between the two companies was cooperative, Spectrofuge promising to aid Beckman in selling its instruments, and Beckman assuring cooperation with regard to parts supply. As Spectrofuge cut more substantially into Beckman's business, however, and as Beckman employees were approached about joining, and as some joined, Spectrofuge, the relationship soured.

Spectrofuge's antitrust and unfair competition charges are premised on three courses of conduct by Beckman which Spectrofuge says were designed to "put Spectrofuge out of business." The first is Beckman's policy regarding exchange drives for UCs. Second, Spectrofuge accuses Beckman of intentional delay in the shipment of parts. Last, Beckman placed on Spectrofuge a credit hold of three weeks' duration—and so informed some of Spectrofuge's customers—at a time when Spectrofuge in fact enjoyed a credit balance. We deal with each.

### Beckman's Exchange Drive Policy

The drive which spins the rotor of an ultracentrifuge is its most commonly replaced part. Although Beckman has apparently sold brand new drives at list prices of $3,600 or $4,200 for preparative and analytical UCs, it was stipulated that Beckman during 1970–73 [21] sold only "exchange," or rebuilt, drives.[22] Beckman's pricing and installation policy concerning the exchange drive is the central focus of this controversy.

We begin our explanation of the mind-boggling price structure for UC drives with two documents issued by Beckman, PX 22A and PX 22B, both dated March 15, 1968, and entitled "Price Schedules and Warranty Provisions for Beckman Ultracentrifuge Drive Units." [23] According to these documents, drive units were "covered by a prorated warranty provision for defects in workmanship or material. In the event of drive unit failure, replacement [was to be] made at an exchange price based on a graduated scale determined by usage." PX 22A, PX 22B. A minimum exchange price equivalent to 1.2 billion revolutions or the actual drive revolutions—whichever the greater—would be charged unless the

---

**20.** The complaint was filed on September 4, 1973, sixteen months from the date of Spectrofuge's birth.

**21.** We do not know whether Beckman sold new drives in 1974.

**22.** See note 3, *supra,* for the definition of an "exchange" part.

**23.** PX 22A is headed "Spinco Bulletin SB–1354L," the "L", as we understand it, being a

designation for preparative UCs. PX 22B is headed "Spinco Bulletin SB–1354E," the "E" designating analytical UCs. (See note 1, *supra,* for an explanation of the difference between the two instruments.) These exhibits are identical except for price differences between preparatives and analyticals and different models of each.

**24.** For example, the graduated scale applicable to certain Model L's would be computed based on the following:

drives were *installed, serviced* and operated in accordance with these conditions, numbers 3, 4, and 5 being the most important to the issues here:

1. The drive unit has been operated within its rated speed and temperature ranges.

2. The drive unit has not been subjected to unequal loading, improper rotor installation or to corrosion from material spilled onto the hub or accumulated in the chamber of the instrument in which it has been installed.

3. The drive unit has been disassembled, modified, or repaired only by Beckman personnel.

4. The drive unit was installed by a Beckman Field Engineer.

5. The instrument in which the drive unit has been used and operated, and its associated rotors, were manufactured by Beckman and serviced only by Beckman Field Engineers.

6. A period of not more than three years has elapsed since the drive unit was installed.

There was no charge for installation when the instrument was covered by a Beckman service agreement. Non-contract customers would be "billed for installation in accordance with established rate schedules." *Id.*

The "Direct Shipment" provision in these exhibits covered non-contract situations where, for example, the non-contract customer could order a drive to keep as a spare.[25] In such event, drive units would be shipped directly to institutions or individuals who would be invoiced at published list price ($3,600 or $4,200). When an installed drive failed, it would be removed and shipped to Beckman who would issue a credit so that the eventual net billing was equivalent to the appropriate exchange price.

As we understand these two exhibits, in light of the trial testimony, a minimum exchange price ($360) and a maximum exchange price ($480 or $540, depending on the UC model in question) were established. Full proration down to zero revolutions would be available to Beckman contract customers. Proration for non-contract customers, *i. e.*, those who failed to meet the six conditions listed above, would begin at 1.2 billion revolutions. The following illustration may aid us in perceiving that the only difference in drive price to a contract versus a non-contract customer would occur in the event that the non-contract customer's drive failed *below* 1.2 billion revolutions, in which case he would pay the minimum exchange price ($360):

| 0 | 1.2B | 2.4B |
| --- | --- | --- |
| | $360 | $480 |

When drive failed below 1.2 billion revolutions, $360 would be prorated downward according to actual use if six conditions were met. If those conditions were not met, customer would get no proration and would pay minimum exchange price of $360.

When drive failed above 1.2 billion revolutions, all customers paid the same price regardless of whether six conditions were met.

| Drive Revolutions in Millions | Price |
| --- | --- |
| 0 – 100 | No charge |
| 100 – 1200 | $.30 per million |
| 1200 – 2400 | $.10 per additional million |
| Over 2400 | No additional charge |

25. Drive failure resulted in a "down" instrument. If this occurred during an experiment, a delay in getting a replacement drive installed disrupted scientific investigation, with concomitant effects on the customer's happiness.

PX 22A and PX 22B end with a paragraph entitled "Exceptions," which reads:

Exceptions to the conditions outlined above must have prior written approval of the Field Engineering and Service Manager, Spinco Division, Beckman Instruments, Inc.

The clear weight of the evidence showed that while the above represented official Beckman policy dating back to 1968, this policy was not followed until July 1973. The deviation lay in the fact that non-contract as well as contract customers received full proration down to zero when drive failure occurred below 1.2 billion. The Spectrofuge employees who had formerly worked for Beckman unanimously stated that when they worked for Beckman full proration was accorded to all customers, irrespective of whether their instruments were serviced under contract with Beckman.[26]

Proration was important to Spectrofuge because a service contract on a UC for one year averaged $280. Without proration, the drive could cost $360 if it failed under the 1.2 billion mark, eliminating the entire value of the contract. Thus, immediately upon Spectrofuge's formation in May 1972, del Valle and Dawson met with Nelms and Jollett of Beckman's Atlanta district office, during which meeting proration was discussed. Beckman told Spectrofuge that it would receive full proration only if Beckman installed the drive and that it would be charged for labor and travel in doing so. Spectrofuge made two inquiries at that meeting. The first was whether it could purchase drives for stock at the exchange ($480) rather than the list ($4200) price. Second, since both del Valle and Dawson were ex-Beckman service representatives, they asked if they could change drives and still get proration (thus saving labor and travel costs involved when Beckman installed them). Nelms responded that he lacked authority to grant either of these requests but he agreed to check with corporate Beckman in California. Nelms never got back to Spectrofuge with answers to these questions.

Pursuant to this discussion, Spectrofuge requested Beckman to conduct all drive changes and, for a while, received full proration (despite condition 5, *supra*), absorbing the cost for labor and travel. In September 1972 Spectrofuge encountered a problem with paying the list as opposed to an exchange price on another exchange part (a board in this instance). Dawson wrote to Ballhaus, President of Beckman, inquiring about the board price matter, and also raised the question of whether Spectrofuge could replace drives. Dawson stated in part:

Spinco says that they only warrant the Drive if it is installed by a B.I.I. Serviceman. Mr. del Valle and myself were factory trained on Ultracentrifuges by B.I.I. We have changed untold numbers of Drives and did so until we resigned from A.I.S.S.D. Now we are informed that a warranty is not offered if we replace Drives ourselves. Those policies serve only to disgust the customers and please remember that they are your customers as well as mine.[27]

Ballhaus' response, dated November 20, 1972, is set out in full:

Thank you for your letter of September 15. We appreciate your interest in cooperating with Beckman Instruments and want to assure you that your organization will be treated as any other customer, within the framework of our established operating policies.

Any part may be ordered through our normal sales order function and will be invoiced at list price. If the part is classified by us as an exchange part, credit for the difference between list and exchange prices will be issued when the defective part is returned prepaid and is found to be in a repairable condition.

---

26. Dawson could not say that he had ever read Beckman's service policy (PX 22A, PX 22B).

27. PX 23.

The same procedures hold true for ultra-centrifuge drive units. In this case, the exchange price is always considered to be equivalent to the maximum usage charge on the drive units with no prorated allowance for less than maximum usage. This policy was established because we cannot control the installation or operation, nor can we determine actual usage when the service is not performed by Beckman.

*In your letter you indicated that one of the benefits of your organization was rapid response. It is difficult for us to see how you can guarantee prompt satisfaction of instrument problems without an immediate inventory of replacement parts available.* This would entail a substantial investment in inventory on your part, as it does with Beckman Instruments. Although any order received by our sales order group will be processed and shipped in a normal manner, the sales inventory does not contain all of the wide variety of parts required for instrument service. Beckman does carry a broad range of parts in its service inventory, but this inventory level is maintained to meet the requirements of the Beckman service organization and is for their own use. *Any part ordered through our normal sales inventory will be processed, but delays could be experienced if the part is not immediately available in stock.*

If you wish to have replacement parts immediately available, *we suggest that you purchase an initial quantity of parts which are most commonly replaced.* From that point, a related part that has a salvage value could be sent to Beckman Instruments for repair and direct return to your stock for subsequent use.

Again, please be assured we will honor any orders for parts, from your organization, within the guidelines described. If you have any questions, please do not hesitate to contact us.[28]

From May 1972 through December 1974, Beckman replaced 66 drives in UCs under service contracts with Spectrofuge. Spectrofuge asserted that Beckman's loss of the large and prestigious Union Carbide contract in March 1973 inspired Beckman to "change" its proration policy by not granting proration on drives which failed below 1.2 billion revolutions.[29]

PX 260A, which is attached as Appendix A to this opinion, sets forth in table form the actual amount Spectrofuge paid for drives and the amount it would have paid had proration been given. The "Drive Differential" column demonstrates that the first time Spectrofuge failed to get proration on a drive which failed *below* 1.2 billion revolutions was on July 24, 1973.[30] It also demonstrates that (i) out of the 66 drive changes, Spectrofuge paid for the drive in 48 instances exactly what a Beckman service contract customer would have paid; (ii) in two of these 48 instances, occurring *after* Spectrofuge won the Union Carbide contract, it was charged nothing for drives failing below 1.2 billion (9/4/73 and 10/19/73 entries) when the allegedly new policy would have required payment of the minimum exchange price; (iii) in two instances it failed to get proration ostensibly accorded all customers (5/30/73 and 8/28/73 entries);[31] (iv) in one instance (11/12/73 entry) it benefited by not paying anything when a Beckman service contract customer would have paid $96;[32] (v) in fifteen instances Spectrofuge paid more

---

**28.** PX 24 (emphasis added).

**29.** Rather than "change of policy," this course of conduct is more accurately characterized as "enforcement of pre-existing policy" as outlined in PX 22A and 22B above.

**30.** On May 30, 1973, Spectrofuge failed to receive a prorated price on a drive which failed *above* the 1.2 mark at 1.509 billion (see Appendix A). This charge appears to be as aberrant

as that for the 11/12/73 entry which occurred after the "policy change" went into effect where Spectrofuge was charged nothing in a situation where a Beckman customer would have paid $96.

**31.** For a discussion of the 5/30/73 entry see note 30, *supra.*

**32.** For a discussion of the 11/12/73 entry, see note 30, *supra.*

than a Beckman contract customer would have and in six of those instances (marked by Spectrofuge with an asterisk), the difference was reimbursed by the customer; (vi) the drive differential total (excluding labor and travel) is $3,561.77. By subtracting from that total the amount reimbursed by Spectrofuge's customers ($975.21) and the amount it gained on the drive installed on 11/12/73 ($96.00), there is an actual out-of-pocket loss on drive charges of $2,496.56 incurred in its second fiscal year of operation. Unreimbursed expense on labor and travel totaled $5,467.

In May 1973, del Valle met with DePalma, Customer Services Manager for Beckman's eastern region. The competitive relationship between Spectrofuge and Beckman was discussed but the parties presented quite different versions of what transpired. According to del Valle:

A. [W]e started out—it was about an hour and a half. . . .

\* \* \* \* \* \*

Then he told me about Union Carbide and he said, "You know, you really made a mistake by getting into Union Carbide."

He said, "Well, that was fatal because now you brought yourself up to even the attention of Dr. Balhaus" [President of Beckman].

I said, "How can that be? What happened?"

He said, that it came up to corporate about Spectrofuge getting this contract. They wanted to know the reason for it. . . .

And, I said, "What does it have to do with the whole thing?"

He said, "Well, I have been told that you had it. Now you have brought yourself to their attention and I have no choice but to put you out of business."

I think I asked him, "Well, how do you propose to do this?"

He said, "Well, there [are] ways."

I asked him, "Do you propose to cut down on your rates to a dollar an hour so I can't compete with you?"

And, he said, "No, they are not going to do that. We already did that at the National Institute of Health and we cut down the rates to get rid of competition, and then we were stuck with them because of the price freeze that came in."

And he said, "Now, in your case, I've got the backing of corporate and I'm quite sure we'll be able to do something to put you out of business."

He also told me that if he was ever confronted with [this], he will deny it. But, he said, "I have no choice. It's either you or me. We are going to put you out of business."

Tr. 1386–87. DePalma's version follows:

Q. Now, during that meeting, is it your testimony that during that meeting you had a discussion with Ray del Valle about putting him out of business?

A. No. I don't believe I said that.

Q. Well, did you have that discussion with Ray Del Valle on that occasion?

A. There was a short period during that conversation where Ray said he would have to take all the business he could to stay alive and I told him I would try to maintain an equilibrium in our business and stop him from taking business away from us.

Q. Now, you mentioned something about it being tongue-in-check. What do you mean by that?

A. Well, he says, "I have to get all I can," and I said, "I'm going to have to stop you from getting all you can."

We were kind of smiling at the time. It wasn't one of those vicious things.

I had just met the man and he had already invited me to dinner at his home.

It wasn't the attitude. It wasn't the atmosphere.

Tr. 2030–31.

Spectrofuge charges that Beckman's refusal to accord proration when Spectrofuge employees installed a drive was unreasonable and that the changed proration policy was the means Beckman employed to drive it out of business. There is no doubt that beginning in July 1973, a no-proration pattern developed. Beckman asserts that the instances in 1972 when Spectrofuge was accorded proration were deviations from its pre-existing policy, the ultimate enforcement having been prompted by a May 24, 1973 letter which Spectrofuge's North Carolina attorney wrote to Beckman.[33] Following receipt of the attorney's letter, Wilson, Service Planning Manager of AISSD, wrote a June 8, 1973 memo to all District and Customer Service Managers which read:

> On the back side of our Price Schedules for drive units, Spinco Bulletins SB–1354E and SB–1354L, dated March 15, 1968 [PX 22A, PX 22B], we specify the conditions under which we will pro-rate the full drive exchange price. If all of the conditions specified are not fulfilled, our policy is to bill a minimum exchange price equivalent to 1.2 billion revolutions, or the actual drive revolutions, whichever is greater.

Although we appear to have been following this policy, there may have been instances in the past where we deviated from the policy as written for various reasons; i. e., misunderstanding or forgetfulness. Although the specified conditions appear to be straightforward, one condition may need further clarification. This is condition # 5 which states, "The instrument in which the drive unit has been used and operated, and its associated rotors, were manufactured by Beckman and serviced only by Beckman Field Engineers." This means that the instrument must either be covered by a Beckman service agreement or serviced exclusively by Beckman Field Service Engineers on a demand, per-call basis. If the instrument is serviced by a competitive service organization, in-house service personnel, or any other non-Beckman employee, the pro-rating provision is invalid.

Please ensure that this policy is strictly adhered to, and advise the appropriate Field Service Representatives.[34]

Spectrofuge asserts that Beckman's proration policy violated § 1 of the Sherman Act and proved the intent element necessary for demonstrating a § 2 attempt to monopolize offense.[35] Because it would have been unprofitable to have serviced instruments in a situation where the replacement of a drive could exceed the value of the servicing contract, Spectrofuge asserts

---

**33.** This letter was not allowed into evidence.

**34.** PX 30. The policy outlined in this memo is consistent with that set forth in an August 13, 1973 letter from Williams, Beckman's District Service Manager in Atlanta, to the Purchasing Agent at St. Jude Children's Research Hospital in Tennessee who was apparently contemplating in-house service of UCs. The portion relevant to proration reads:

> . . . I am writing to explain our policy with regard to your servicing the Beckman Spinco centrifuges at the hospital.
>
> \* \* \* \* \* \*
>
> The warranty on the parts supplied would be changed somewhat, especially in regard to the drive units. When the instrument is serviced and maintained by us, a replacement

drive is pro-rated according to the revolutions it has done. As many other malfunctions in the instrument over which we would have no control can cause drive problems, the pro-ration is changed considerably and the exchange drives would cost more. The same policy would apply to exchange printed circuit boards and the like.

PX 102. Spectrofuge points to the fact that Beckman prorated for NIH-Maryland whose in-house personnel serviced instruments. This matter is discussed in note 100, infra.

**35.** At trial, plaintiff voluntarily withdrew its claim under § 3 of the Clayton Act, 15 U.S.C.A. § 14, and the District Court directed a verdict against Spectrofuge on its § 13 Robinson-Patman claim, 15 U.S.C.A. § 13. Spectrofuge does not appeal from this ruling.

that Beckman's failure to prorate below 1.2 billion revolutions when the UC was not serviced by Beckman constituted an anti-competitive activity which "stopped it cold." Main brief at 37. Thus, it was unable to bid on, or to compete for, service contracts in three specific cases: (i) the NIH-Bethesda, Maryland contract involving about $100,000 in service agreements; (ii) instruments located in Houston (about $25,-000); [36] and (iii) instruments located at the University of Alabama (about $20,000).[37] In addition to damages sought for this lost business, Spectrofuge asked for $8,053.56 in drive overcharges.[38]

Beckman countered these charges by arguing first that despite Ballhaus' advice,[39] Spectrofuge refused to acquire an inventory of drives.[40] Had it done so, Spectrofuge could have established its own proration policy as to those it stocked. Thus, Spectrofuge in effect expected Beckman to subsidize it. With regard to the lost contracts at NIH-Maryland, Houston, and Alabama, Beckman asserts that it was Spectrofuge's lack of service capability and lack of success in recruiting—and not the proration policy—which kept it from bidding or seeking that work.[41]

*Parts Delays*

Spectrofuge accuses Beckman of intentionally delaying the shipment of parts. This conduct is charged to be a restraint of trade and indicative of intent to monopolize.

In the period between May 1, 1972, and the end of 1974, Spectrofuge placed 50 parts orders with Beckman exclusive of drives. The Beckman documents on each of the 50 orders were received into evidence as DX 173A–173XX.[42] For proper evaluation of the merits of the parties' contentions on

---

36. See text at note 18, *supra.*

37. See text at note 19, *supra.*

38. This figure derives from PX 230A, Appendix A:

| | | |
|---|---|---|
| Differential in drive costs | $3,561.77 | |
| Less: amount reimbursed by customer | 975.21 | |
| Cost on drives | | $2,586.56 |
| Total labor & travel | 5,629.50 | |
| Less: amount reimbursed by customer | 162.50 | |
| Cost on labor & travel | | 5,467.00 |
| Total drive, labor & travel costs | | $8,053.56 |

39. See text at note 28, *supra.*

40. Spectrofuge's witnesses admitted that they never stocked UC drives.

41. Beckman's position is that Spectrofuge did not prove injury in fact as to the Alabama, Houston, and NIH contracts. (For a discussion of the Beckman-NIH contract requirements, see note 100, *infra.*) The District Court agreed with Beckman on Alabama and Houston and ordered what in effect was a partial judgment n. o. v. with respect to those claims. See text accompanying note 65, *infra.* We agree with Beckman as to the NIH contract as well. Spec-

trofuge had no employees located in Maryland. It had one experienced employee, Jackson, who may have been willing to relocate to Maryland. Autry, while qualified, was stationed in North Carolina servicing Research Triangle area contracts. Gonzales—apparently nothing more than an errand runner—could not have handled the service work. Furthermore, the proration policy did not prevent Spectrofuge from bidding for work in locations where it had personnel. Thus, the jury awarded lost future profits for a two-year period on a contract on which Spectrofuge had never bid, at an institution located in an area where it had no service personnel, and which at times required for its performance more men on a daily basis than were employed by Spectrofuge in toto (see note 100, *infra* ). Thus, quite apart from other failures of proof discussed in detail below, the "lost" NIH contract, resting as it does on the speculation, "if we had bid we would have won," was not proved with any degree of certainty to have been the result of Beckman's conduct. That is to say, the evidence could not support a finding that Beckman's drive policy materially contributed to Spectrofuge's failure to bid. *Terrell v. Household Goods Carriers' Bureau,* 5 Cir., 1974, 494 F.2d 16, 20.

42. We used DX 173AA–173XX to form the basis of this chart since the parts orders exhibits submitted by the plaintiff (PX 64a–f, PX 65–67, PX 138B, PX 151, PX 152) were hopelessly disorganized. See note 47, *infra.*

this issue and in an effort to shorten this opinion, we prepared in chart form, and have attached as Appendix B, a summary of DX 173A–173XX showing the date parts were ordered, the shipping instructions requested, the date shipped, and the actual delay in days.

Spectrofuge sought damages for parts delays in three specific instances:

(1) On July 3, 1973, Spectrofuge ordered a board needed for a "down" liquid scintillation counter which it serviced under contract with Dr. Cerutti of the University of Florida (see DX 173GG on Appendix B). The part was shipped 65 days later on September 9. As a result of this delay, Dr. Cerutti cancelled the contract in mid-year and Spectrofuge had to refund to him

$607.48. Spectrofuge sought this amount in damages, plus the loss of $3,500 in annual contracts with Dr. Cerutti for two years.[43]

On August 15, Dawson called Beckman in Atlanta to inquire about the delay. He was met with the fact that Beckman had placed a credit hold on Spectrofuge,[44] which meant no service and no parts, even on a C.O.D. or cash basis. Dr. Cerutti personally appealed to Beckman and delivery was finally accomplished.

(2) On June 11, 1973, Farnham ordered two damper assemblies and one circuit breaker (see Appendix B, DX 273DD) for an amino acid analyzer and a UC, which, according to del Valle, were under Dr. Popp's control at the Union Carbide-Oak Ridge facility. While Farnham's testimony

---

43. Spectrofuge's agreement with the University of Florida (PX 317H) covered two (Models LS–230 and LS–233) liquid scintillation counters under Dr. Cerutti's personal control, both priced at $435 per year. According to Dr. Cerutti, there were approximately six Beckman liquid scintillation counters in the Biochemistry Department including his two. Tr. 1153–54. Del Valle testified as follows:

Q Was the contract renewed on those two liquid scintillation counters while you were at the University of Florida and Dr. Cerutti?
A No, sir.
Q Did you have any other liquid scintillation counters up there at the University of Florida?
A Yes, sir.
Q Besides these two?
A Yes, sir.
Q How many others did you have on the contract?
A I think there were three more at that time under contract.
Q Have those contracts been renewed at the University of Florida?
A These three others? No.
Q How much did the contract run on the liquid scintillation counters?
A Approximately $1500 [sic] apiece.
Q Do you know whether or not there were other liquid scintillation counter—Beckman liquid scintillation counters at the University of Florida in the Biochemistry Department besides these two and the three we talked about, which is five? Were there any other liquid scintillation counters up there?
A I think there is two more, possibly three.
Q Did you have contracts on those?
A No, sir.
Tr. 1455–57.

We have compared Spectrofuge's 1973–74 University of Florida contract (PX 317H) with that for 1974–75. The only instrument "lost" other than the two Cerutti liquid scintillation counters is a "Model E" instrument for Dr. Fried (contract price $660). We were under the impression that an "E" was an ultracentrifuge. In any event, we have looked at all the contracts in a folder entitled "Contracts *Univ. of Fla.* [Pltf's] 317H" and can find none which covers any other "Model LS–230," "Model LS–233," or "liquid scintillation counters" so described, none with contract prices at $435 per instrument, none at $500 per instrument (just rounding off $435) and certainly none at $1500 per instrument. Thus, we are at a loss as to how Spectrofuge arrived at the $3,500 figure. Plaintiff's counsel stated during closing argument that his client lost seven contracts at the University of Florida at $500 each for a total of $3,500.

After the jury returned the verdict, the Court noted that it had given plaintiff damages in excess of those asked for during closing argument. Counsel responded, "They had all the contracts back there. I don't know what they did back there, but they had all the contracts." As best as we can determine, the jury was out for about four hours. If the contracts were presented to the jurors in the same manner presented to us, see note 47, *infra*, we have a fair idea of what the jury "did back there."

44. The credit hold was instituted on July 27, 1973 and was lifted on August 17. See the following subsection.

on this score is hardly a model of clarity (Tr. 800–01), as we understand it, he prevailed upon Union Carbide to order the damper assemblies in its own name directly from Beckman. Union Carbide obtained them on August 13, and those ordered by Farnham for Spectrofuge did not arrive until October. According to del Valle, Dr. Popp thereafter withdrew his instruments [45] from the blanket Union Carbide contract. Spectrofuge sought $2,277.51 per

---

**45.** Del Valle did not specify the number or type of instruments lost from the service contract.

**46.** We have compared Spectrofuge's 1973–74 Union Carbide contract (PX 270) with that for 1974–75 (PX 317I). Other than the absence of the instruments located in Rockville, Maryland (see item (3) discussed below), we can find only the following instruments missing for 1974–75:

| Instrument | Property No. | Annual Contract Price |
|---|---|---|
| UC Model L | Y138100 | $ 145.50 |
| Amino acid analyzer Model 120 | Y125887 | 387.03 |
| Amino acid analyzer Model 120-C | Y154141 | 576.18 |
| Sequencer Model 890 | Y164866 | 645.05 |
| | Total | $1,753.76 |

There is no indication in the record that these four instruments were the ones under Dr. Popp's control. Even if they were, we cannot determine how Spectrofuge arrived at the $2,277.51 figure.

**47.** We were unable to match an order for a "refrigeration cam" with any of the orders contained in DX 173A–173XX, Appendix B, or with PX 64a–f, PX 65–67, PX 138B, PX 151, PX 152 which were parts orders introduced by plaintiff. Perhaps a refrigeration cam is known by some other name. In any event, Spectrofuge's briefs point us to no documents from which we could determine any specifics on this delay other than two pages of del Valle's testimony and the Union Carbide contract itself which does not include an indication of the instrument owner (*i. e.*, Dr. Faust).

The problems we have had in reviewing this case, those set forth in notes 43 and 46, *supra*, to mention just a few, compel us to comment on the manner in which both parties presented this case on appeal.

year [46] for two years on the loss of these contracts.

(3) According to del Valle, Spectrofuge experienced delay in obtaining a refrigeration cam for an instrument under the control of Dr. Faust located at Union Carbide-Maryland.[47] When the Union Carbide contract came up for renewal, Spectrofuge was not invited to bid on the Maryland instruments which had been under blanket coverage with Union Carbide-Oak Ridge, result-

---

We are the first to encourage all to minimize the cost of reproduction. However, out of hundreds of documents which we received, only about 115 exhibits were reproduced in the appendix on appeal and the vast majority of those (PX 166–230) comprised the backup documentation for the summary chart of PX 230A set forth here as Appendix A. An example of "selective" appendix printing was the exclusion of several credit hold documents which had to be retrieved from the files to nail down the chronology and understand the testimony. Some exhibits were illegible and the parties did not agree on and submit to the court below or to us a clean typed version of the illegible documents.

The exhibits not printed in the appendix were placed in folders and neither the folders nor their contents were presented in any discernible order. Plaintiff's exhibits were mixed in with defendant's exhibits; documents received in evidence were in some instances mixed in with those excluded. A University of Florida contract folder contained contracts with the EPA and Coulter Diagnostics. Finding an exhibit outside the appendix was similar to but not as much fun as an Easter egg hunt. Looking at the exhibits themselves was necessary because the District Judge for reasons which seem to us to be very doubtful refused to allow them to be read to the jury during the trial. This problem was further exacerbated by the fact that the trial transcript was not corrected except for a post-trial stipulation with regard to plaintiff's closing argument. The transcript errors often threw us off course. In other cases, the small exhibit identifying slips were separated from the documents and were lying loose in the folders. Thus, we were unable to identify some exhibits by any number and to match them with testimony.

In addition, the parties left from the printed appendix testimony which we considered to be critical. Our review of the entire trial transcript was therefore necessary. (Chunks of

ing in a loss of $2,511.33 annually.[48] Spectrofuge sought that amount for two years.

According to Conway, Product Service Manager of the Spinco Division, (i) when the order for the damper assemblies arrived in California, the computer indicated, as shown by the "–154" on DX 173DD, that there were 154 damper assemblies already on order; (ii) the order was for a discontinued product that had been discontinued several months prior to this order; and (iii) a Beckman field service representative would normally carry damper assemblies as part of his service inventory.

As for parts delays in general, both parties' evidence indicated that Beckman service representatives were equally plagued by the problem (Tr. 465–66, 2071; PX 109, PX 110, PX 111). At one point, when del Valle complained about the delays to DePalma (Customer Service Manager, Eastern Region), DePalma replied, "That makes two of us. . . ." Tr. 466. When DePalma checked into the matter, he discovered that most all of Spectrofuge's initial orders were placed on an emergency basis and he in-structed Beckman-Atlanta that Spectrofuge was thereafter to be treated in the same manner as Beckman's biggest customer in the district, "SDC"[49] in determining the frequency with which orders would be honored on an emergency basis. Beckman employees informed some institutions that if they placed instruments under service contracts with Spectrofuge, they would, or could expect to, experience parts delays. Jackson stated that while he worked for Beckman, Bentley (a Beckman service representative in the Research Triangle area) had, on two or three occasions, delayed calling a Spectrofuge order into Atlanta for periods up to a week.

Spectrofuge was not dependent on Beckman for all parts;[50] some—even major components—could be purchased from other sources. According to Dawson, Spectrofuge maintained an inventory valued between $400–800.[51] Farnham stated that he had purchased some parts from the field service inventory of Beckman and that they had tried to help him out in some emergen-

---

transcript were stapled together and had to be unstapled before we could read it.) Consequently, the testimony and exhibit appendices were virtually useless.

In complex antitrust cases—traditionally heavy paper litigation—necessitating as this one does a thorough review of *all* the evidence, *Boeing Co. v. Shipman*, 5 Cir., 1969, 411 F.2d 365, 375 n. 16 (en banc), the manner in which a case is presented to us is terribly important. Federal courts are sufficiently burdened as it is without having to spend hours finding and organizing the parties' evidence. Litigants can expect *from the Court a detailed review of the record*, but when it is presented in the fashion experienced by us that expectation asks too much. Such appellate presentations tax both our resources and patience and reduce the parties' chances to receive an expeditious decision. This matter would have had more serious consequences had it been necessary for us to decide the individual injury in fact questions.

Parties are entitled to expect consideration by the Court of the record. For the Court to do that the record must be available in a form which, saving excess printing costs, enables Judges to see and hopefully assimilate what a party (or both) thought was significant. What we cannot find, and hence cannot see, we can hardly understand. And what we cannot un-derstand through the fault of litigants results not alone in possible damage to the interests of litigants, but to the law itself which builds on case by case with the expectation that counsel have done their job.

**48.** We assume that this figure was reached by adding the contract prices for all the instruments designated as "MAN Program, Rockville, Md." on PX 270.

**49.** We wonder if this is a reference to the Center for Disease Control (CDC) in Atlanta.

**50.** There was at least one manufacturer of UC drives other than Beckman—Morrow. However, Beckman's rotor warranty was voided when a non-Beckman drive was installed in one of its UCs. Spectrofuge did not want to risk invalidating this warranty by purchasing drives from another source.

**51.** Del Valle stated that Spectrofuge at times carried an inventory amounting to $6,000–7,000; at others, its inventory would be depleted. Spectrofuge's federal tax returns showed no valuation figures for inventory. When del Valle worked for Beckman, he carried in his car inventory valued between $3,000–4,000.

cy situations.[52] But, as Ballhaus had warned in his November 1972 letter to Spectrofuge,[53] orders for Beckman parts had to go through sales inventory channels. Also relevant to the parts delay problem is the following testimony of Dawson:

THE COURT: . . . The question is, did you not expect to receive the same service and consideration from Beckman after you left as you had while you were employed with them?

THE WITNESS: Yes, sir.

Tr. 121.

*Credit Hold*

In the summer of 1973, Beckman placed a three-week credit hold on Spectrofuge during which period it refused to supply parts or service even on a C.O.D. or cash basis. The chronological sequence of events surrounding this incident is as follows:

1. June 14, 1973. A computer-generated letter from Beckman's corporate credit department was sent to Spectrofuge requesting payment.

2. June 21, 1973. Del Valle wrote[54] to DePalma in *Atlanta* questioning charges on three invoices which, for convenience, we shall call "Group A" invoices. He submitted a partial payment ($1,360), excluding payment for the amount contested. He asked DePalma to let him know if DePalma disagreed. DePalma's principal office was located in Mountainside, New Jersey, and del Valle knew this, but DePalma also had an office in Atlanta. The invoices contained an instruction to remit payment to a lock box in Atlanta.

3. June 21, 1973. A second computer-generated letter from Beckman's corporate credit department was sent to Spectrofuge requesting payment.

4. July 19, 1973. DePalma wrote to Wilson (Staff Operations Manager, California) and forwarded to him del Valle's June 21 letter and the Group A invoices, asking Wilson, in conjunction with Anderson (Corporate Credit Manager, California) to insist on full payment of the invoices.

5. July 24, 1973. Del Valle wrote to DePalma in Atlanta regarding two invoices, one of which he stated was in error ("Group B" invoices). He transmitted full payment of the Group B invoices ($1,141.40) under protest.

6. July 26, 1973. A third computer-generated letter from Beckman's corporate credit department was sent to Spectrofuge requesting payment.

7. July 27, 1973. Del Valle wrote to DePalma in Atlanta pointing out overcharges on two out of three invoices ("Group C"), and submitted partial payment of these invoices ($1,619.60).

---

**52.** PX 129 is a May 1, 1973 letter from Tucker (Beckman's sales representative in the Raleigh-Durham area) to Jollett (Beckman's District Sales Manager in Atlanta) in which Tucker advised:

It is all right now, if the Packard salesman calls and gives me a PO [purchase order?] to sell an instrument for them?

Evidently I get this message from service when Spectrofuge can call them, give them a PO and have our service install a stock drive for one of their customers on our centrifuge. Why are we forced to support a direct competitor? They are NOT a customer but in direct competition to our service. Spectrofuge i. e. Larry Autry, is even recommending competitive instruments to people now. Mr. Autry recommended to a doctor at Duke that he buy a Unicam spectrophotometer only two weeks ago and then had the audacity to tell me that he did so.

If a sales competitor wants a piece of our equipment he buys it through sales channels and does not receive special consideration. We are supporting Spectrofuge by selling from service inventory and ourselves paying the costs in inventory to sell to Spectrofuge, our competitor. That's the dumbest _____ thing I have ever heard. Are we tr[y]ing to force ourselves out of the service business? The smartest thing we can do is treat them like a sales customer and ship from sales stock from sales depots at list price plus shipping.

Let's quit ripping ourselves off.

Emphasis in original. As far as we can tell from the record, Spectrofuge continued to receive drives out of service inventory and never had to pay list price for them.

**53.** See text at note 28, *supra*.

**54.** The del Valle letters (see also items 5, 7, 10, 13) were sent certified mail.

8. July 27, 1973. Wilson went to see Anderson and took with him DePalma's July 19 letter, which had transmitted del Valle's June 21 letter and partial payment. Anderson checked the computer and determined that the Spectrofuge account was in arrears. Anderson immediately issued the credit hold and sent a telex to DePalma instructing him not to provide service. or parts without his approval. Anderson tried to call del Valle but was unable to reach him; he did not leave a message. When Jollett (District Sales Manager, Atlanta) learned by telex of the credit hold, he checked with his manager who instructed him to call del Valle. When Jollett did so, del Valle, after learning of the credit hold, told Jollett that Spectrofuge did not owe Beckman any monies. He also made a cash or C.O.D. proposal. Jollett said the matter was out of his hands. Del Valle—according to Jollett—told him that the credit hold was a "bad move" on Beckman's part. Del Valle requested written confirmation of the credit hold.

9. July 30, 1973. Anderson wrote del Valle confirming the credit hold, enclosing a statement of the past due account ($3,146), and asking for full payment.

10. August 1, 1973. Del Valle received Anderson's July 30 letter and responded by enclosing (i) a check for $285 which represented payment for the withheld amount on the Group A invoices (June 21 entry); (ii) a check for $100 which represented payment for the withheld amount on the Group C invoices (July 27 entry); (iii) copies of his June 21 and July 27 letters to DePalma; and (iv) a check for $998.60 to cover payment of other invoices. Del Valle did not mention or enclose a copy of his July 24 letter to DePalma in Atlanta or the $1,141.40 payment which had accompanied it.

11. August 2–5, 1973. The first occasion when Spectrofuge needed a part occurred in this period. Del Valle called Williams in Atlanta who told him that until he

(Williams) got a release from Anderson, Beckman could not give him service.[55]

12. August 6, 1973. Anderson wrote to del Valle acknowledging receipt of his August 1 letter and the three checks totaling $1,383.60. He asked del Valle if Spectrofuge had paid the Group B invoices (July 24 entry). Anderson sent copies of this August 6 letter to DePalma and Wilson.

13. August 9, 1973. Del Valle wrote Anderson acknowledging receipt of his August 6 letter and stating in summary that Spectrofuge had never owed Beckman any monies and, in fact, because of Beckman's having invoiced the same job twice, which he had paid twice, Spectrofuge enjoyed a credit balance of $530.·

14. August 16, 1973. DePalma wrote to del Valle acknowledging receipt of his June 21, July 24, and July 27 letters and stating that (i) the Group A and Group B invoices had been processed to credit Spectrofuge only for the tax it had been charged; the difference between the amounts invoiced and that paid was to be handled by Anderson; and (ii) he (DePalma) was forwarding the Group C invoices and payment to Anderson.

15. August 17, 1973. DePalma called Anderson and told him that he had a check from Spectrofuge in Mountainside for $1,097.50 which he would forward to California. Anderson immediately released the hold and advised del Valle of this release by telegram the same day.

16. August 28, 1973. Anderson wrote to del Valle and confirmed that Spectrofuge had a credit balance of $530.

Del Valle admitted that throughout this period he never called Anderson in California. He also stated that the credit hold "hit us right in the middle" of Spectrofuge's discussions with counsel about bringing suit (the complaint was filed on September 4, 1974).

During the period of the hold, Beckman employees informed several Spectrofuge

---

**55.** Williams testified that during this conversation, he told del Valle to call Anderson in California to straighten it out. Del Valle denied this but confirmed that Williams had said that the matter had to be resolved by corporate credit.

customers of the credit problem. In some instances the information was supplied on request by the customer; in others it was volunteered. Spectrofuge contended that the credit hold was wrongfully placed and sought, under Florida common law, damages for the two-year loss of a service contract (value $3,200 annually) [56] with the VA Hospital in Durham, for a total of $6,400.[57]

### III. Verdict, Final Judgment, And Issues Presented

The trial court refused to permit Spectrofuge to submit the question of punitive damages to the jury. In closing argument, plaintiff itemized the antitrust damages sought as follows: [58]

```
 59
1. Overcharges on drives $8,053.56

2. Loss of contract at
Union Carbide-Maryland (Dr.
Faust): $2,511.33 per year 60
for at least two years 5,022.66

3. Refund to Dr. Cerutti
for mid-year cancellation
($607.48) plus loss of liquid
scintillation counter contracts
at Univ. of Fla.: $3,500 per 61
year for at least two years 7,607.48

4. Loss of contract at Union
Carbide-Oak Ridge (Dr. Popp):
$2,277.51 per year for at least 62
two years 4,555.02

5. Profit from NIH-Maryland
($100,000), contract work in
Alabama ($20,000), and contract
work in Houston ($25,000) at 63
20.5% profit for two years 59,368.00
 _____
 $84,606.72
```

Spectrofuge's counsel told the jury that the total damages were at least $83,000 on the antitrust claims. Plaintiff sought $6,400 on its common law claim for the cancellation and loss of the VA Hospital due to the credit hold-inspired parts delay.[64]

Beckman asked for damages on its counterclaims totaling $30,000 which covered profits (figured at 10%) from contracts lost as a result of Spectrofuge's wrongful conduct in pirating its employees, costs involved in replacing those employees, and extra travel costs involved in order to maintain warranty servicing in Tennessee after losing personnel and contracts to Spectrofuge.

The jury returned a general verdict for Spectrofuge on the antitrust claims for $85,000 and for $6,700 on its common law claim. The jury also returned a verdict in favor of Spectrofuge, del Valle and Dawson on Beckman's counterclaims. Judgment was entered on the verdicts awarding Spectrofuge treble damages of $255,000 for a grand total of $261,700.

Plaintiff then submitted affidavits supporting a request for attorneys' fees. Beckman moved for judgment n. o. v. or, in the alternative, for a new trial. On March 18, 1975, the Trial Court issued an Order with respect to the JNOV motion which reads in part:

56. This figure was probably reached by adding the prices on Spectrofuge's unsuccessful bid on this work (DX 126) which total $3,212 and rounding off the total.

57. During the hold, a drive in a Beckman UC failed and the Hospital's instrument was down. Beckman refused to install the drive based on Anderson's instructions. The Hospital ordered a drive directly from Beckman but was told it would have to pay the list price of $4,200 until Beckman, upon its receipt, determined that the drive was in repairable condition. Credit would then be given to the Hospital who would ultimately pay the exchange price. The Hospital, put off by this price, cancelled the order and there is no doubt that Spectrofuge lost the VA contract at least in part because of the drive problem. Another factor causing Beckman to lose this bid was its inability to service the VA's gamma radiation counter, although the evidence indicates that the VA would have accepted a partial bid from Spectrofuge for the UC work alone.

58. The parties post-trial stipulation to correct the record forms the basis for these figures.

59. See text following note 32 and note 38, supra.

60. See notes 47 and 48, supra, and accompanying text.

61. See note 43, supra, and accompanying text.

62. See note 46, supra, and accompanying text.

63. When we do this multiplication we get $59,-450. As to NIH, Houston and Alabama, see notes 18, 19, 36, 37 and 41, supra, and accompanying text.

64. See note 57, supra, and accompanying text.

1) As to plaintiff's antitrust claims, the evidence is legally insufficient to support the jury's award to plaintiff as to his prayer for loss of service contracts at the University of Alabama claimed to be valued at $8,000.00, and at the institutions located in Houston, Texas claimed to be valued at $10,000.00,[65] and further

2) as to plaintiff's common law claim, the evidence is legally insufficient to support the jury's award to plaintiff to the extent that it exceeds plaintiff's prayer for damages.

It is, therefore, directed that a remittitur in the sum of $18,000.00 as to plaintiff's antitrust claims, that is, $54,000.00 when trebled, and in the sum of $300.00 as to plaintiff's common law claim, totalling $54,300.00, be entered within ten days, or a new trial shall be granted.

In all other respects, the Motion for Judgment Notwithstanding the Verdict, or in the alternative for a New Trial, hereby is DENIED.

The Court reserved ruling on attorneys' fees. Spectrofuge subsequently remitted the required amount under protest.

Spectrofuge then sought a permanent injunction. The Court entered a final judgment awarding Spectrofuge $207,400 and $25,000 in attorneys' fees, dismissing Beckman's counterclaims on the merits, and denying injunctive relief. Thereafter, Spectrofuge brought motions for modification to alter or amend the final judgment with respect to the attorneys' fees award and the denial of an injunction. Both were denied, the District Court entering findings of fact and conclusions of law as to the latter.

On appeal, Beckman first attacks the sufficiency of the evidence to support the jury's findings that Beckman had monopolized or attempted to monopolize a relevant market in violation of § 2 of the Sherman Act and that its conduct constituted an unreasonable restraint of trade under § 1 of the Act. Beckman also challenges the jury instruction given with respect to the requisite elements for an attempt to monopolize claim. Third, Beckman asserts there was insufficient proof to support the finding of injury in fact under § 4 of the Clayton Act and the award of lost future profits. Finally, Beckman contends that the Trial Court erred in denying its motion for a new trial with respect to Spectrofuge's claims and its counterclaims.

On its cross-appeal Spectrofuge challenges the order to remit,[66] the denial of its application for an injunction, the failure to submit the question of punitive damages to the jury and the award of unreasonably low attorneys' fees.

After a long and arduous journey from Baltic and Mediterranean, through Ventnor and Marvin Gardens, and ending at Boardwalk and Park Place, we now reach the question of Monopoly.

### IV. The Section 2 Claim

Section 2 of the Sherman Act, 15 U.S.C.A. § 2, provides that "[e]very person who shall monopolize, or attempt to monopolize, . . . any part of the trade or commerce" shall be guilty of an offense. In *United States v. Grinnell Corp.,* 1966, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778, the Supreme Court stated that the "offense of monopoly under § 2 . . . has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic acci-

---

**65.** The Trial Court apparently reached these figures by applying a 20% profit figure to the Alabama and Houston claims, instead of 20.5%. See text at note 63, *supra.*

**66.** As pointed out in note 41, *supra,* the order to remit amounted to a partial JNOV since it was based on insufficiency of the evidence. See text at note 65, *supra.* Because of this, the

result we reach in Parts IV and V, *infra,* and the Supreme Court's intervening decision in *Donovan v. Penn Shipping Co.,* 1977, 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112, the question of whether Spectrofuge can challenge on appeal the propriety of a remittitur order to which it agreed is totally foreclosed.

dent." Monopoly power is the power to fix prices and to exclude competition. *E. g., United States v. du Pont & Co.,* 1956, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (the Cellophane case). The attempt offense also has two elements: (1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt will be successful. *E. g., Aviation Specialties, Inc. v. United Technologies Corp.,* 5 Cir., 1978, 568 F.2d 1186; *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 5 Cir., 1976, 537 F.2d 1347; *Sulmeyer v. Coca Cola Company,* 5 Cir., 1975, 515 F.2d 835; *Cliff Food Stores, Inc. v. Kroger, Inc.,* 5 Cir., 1969, 417 F.2d 203; *E. J. Delaney Corp. v. Bonne Bell, Inc.,* 10 Cir., 1975, 525 F.2d 296, 305.[67] Because we are presented with a general verdict,[68] we must assume that the jury found Beckman liable for both monopolization and attempt to monopolize in assessing whether JNOV should have been granted.

■ Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement under § 2. It is essentially a matter of resolving factual issues. *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 5 Cir., 1977, 553 F.2d 964; *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 5 Cir., 1976, 537 F.2d 1347; *Sulmeyer v. Coca Cola Co.,* 5 Cir., 1975, 515 F.2d 835; *Case-Swayne Co. v. Sunkist Growers, Inc.,* 9 Cir., 1966, 369 F.2d 449, *rev'd on other grounds,* 1967, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621; *see generally* Sullivan, *Antitrust* § ‘ 12, at 41 (1977) [hereinafter cited as Sullivan]; Comment, Determination of the Relevant Product Market, 26 Ohio S.L.J. 241, 242 (1965); Note, The Market: A Concept in Anti-Trust, 54 Colum.L.Rev. ‘580 (1954). Although some others disagree with us,[69] it is the law of the Fifth Circuit—with which the majority of our sister Circuits around the country agree—that definition of the relevant market is required in attempt cases as well as in monopolization cases. *E. g., Aviation Specialties, supra; Yoder, supra; E. J. Delaney, supra.*

Thus, our initial task in reviewing the jury finding, in light of the *Boeing* standard[70] is to examine the evidence support-

**67.** We agree with Beckman that it was entitled to an instruction on the "dangerous probability" element.

**68.** See the "asterisked" footnote at the beginning of this opinion.

**69.** *Lessig v. Tidewater Oil Co.,* 9 Cir., 1964, 327 F.2d 459, 474, *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046. We are also aware that there is a good deal of commentary devoted to the question of whether market definition should be required in attempt cases. *E. g.,* Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section 2,* 72 Mich.L.Rev. 373, 384, 418 (1974); Blecher, *Attempt to Monopolize Under Section 2 of the Sherman Act: "Dangerous Probability" of Monopolization Within the "Relevant Market",* 38 Geo.Wash.L.Rev. 215 (1969); Turner, *Antitrust Policy and the Cellophane Case,* 70 Harv.L.Rev. 281, 304–08 (1956); Comment, *Attempt to Monopolize Under the Sherman Act: Defendant's Market Power As a Requisite to a Prima Facie Case,* 73 Colum.L. Rev. 1451 (1973); Comment, *The Propriety of the Single Firm's Product as the Relevant Market in Attempt to Monopolize Cases,* 29 Baylor L.Rev. 77 (1977); Note, *Prosecutions for Attempts to Monopolize: The Relevance of the Relevant Market,* 42 N.Y.U.L.Rev. 110 (1967); *see also* Comment, *The Relevant Market Con-*

*cept in Conspiracy to Monopolize Cases under Section 2 of the Sherman Act,* 44 Univ. of Chi.L.Rev. 805 (1977). Whatever the merits or demerits on both sides of the controversy, the question is settled in the Fifth Circuit—at least until this Court en banc or the Supreme Court rules otherwise.

**70.** In *Boeing Co. v. Shipman,* 5 Cir., 1969, 411 F.2d 365, 374–75 (en banc), this Court set the standard of review which is applicable to the present case:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to

ing the definition of the relevant market within which Beckman's power to control prices or to exclude competition must have been measured. *See, e. g., Telex Corp. v. International Business Mach. Corp.*, 10 Cir., 1975, 510 F.2d 894, 914; *Sullivan, supra.*

Spectrofuge asserts that Beckman has monopolized or attempted to monopolize a relevant product market which consists of servicing Beckman scientific instruments, and a submarket which comprises servicing Beckman ultracentrifuges.[71] Main brief at 32, 34. Beckman, on the other hand, urges that there is no definable market for servicing alone; rather, servicing is an integral part of the sale and marketing of scientific instruments.

Spectrofuge's position on the geographic market is far from clear. It stipulated prior to trial that it was engaged in servicing Beckman equipment in Florida, Tennessee, North Carolina, and Maryland. In opening argument, counsel told the jury that "Beckman is divided into regions, and the evidence will show that the region primarily involved in this case is the eastern region of the United States." Tr. at 7–8. Beckman's Eastern Region includes five districts: Boston, Mountainside, New Jersey, Philadelphia, Washington (alternatively called the Silver Springs district) and Atlanta. Coun-

sel went on to state to the jury that the district primarily involved is the Atlanta district, which includes Florida, Georgia, Mississippi, North Carolina, and Alabama.[72] In colloquy concerning Beckman's motion for a directed verdict, Spectrofuge's counsel seemed to take the position that the geographic market was composed of the Atlanta and Silver Springs districts.[73] Tr. 1756–57. Plaintiff's main brief refers to three different geographical areas: (i) the Atlanta district (at pages 9 and 36), (ii) the Silver Springs district (at page 36), and (iii) the "Eastern Region of the United States" (*id.*). Its reply brief mentions the Atlanta and Silver Springs districts together (at page 4).[74] Nowhere has Spectrofuge stated in a simple declarative sentence what it contends the geographic market to be. Beckman's position is clear: the marketing and servicing of scientific instruments is nationwide in scope.

The evidence adduced with regard to cross-elasticity of demand[75] disclosed that scientific instrument manufacturers[76] generally service only their own products. There is apparently very little competition to obtain service contracts on other manufacturers' instruments. Although the matter had been considered, Beckman has nev-

---

the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

(Footnotes deleted.)

**71.** Spectrofuge alleged in its first complaint that it was "engaged in the business of servicing ultracentrifuges manufactured and sold" by Beckman. Its amended complaint states that Spectrofuge is "engaged in the business of servicing the more sophisticated or complex scientific instruments and equipment manufactured and/or sold" by Beckman.

**72.** Tr. 8. The Atlanta district also encompassed Tennessee and South Carolina, and excluded the southern half of Mississippi.

**73.** The Silver Springs district encompassed Washington, D. C., Maryland, Virginia, and the five northern counties of West Virginia. Tr. 980.

**74.** We point out in passing that Spectrofuge sought and the jury awarded damages for the loss of future contracts in Houston, Texas, which is outside both the Atlanta and Silver Springs districts, and in Bethesda, Maryland (location of the National Institute of Health), which is outside the Atlanta district.

**75.** Cross-elasticity of demand is the responsiveness of the consumer to price changes among products which are reasonably interchangeable. *E. g., United States v. du Pont & Co.*, 1956, 351 U.S. 377, 394–95, 404, 76 S.Ct. 994, 100 L.Ed. 1264.

**76.** For a discussion of the scientific instrument market, see *infra* this section.

er bid on contracts to service non-Beckman instruments in the Atlanta district. Thus, from one perspective, we are dealing with a market structure in which manufacturers are vertically integrated, the major competition occurring at the sales level and not at the servicing level.

The record discloses that there are innumerable "just plain service organizations" throughout the United States. However, in the eastern region of the country, there are only two organizations other than Beckman which service the Beckman UC: Arden and Spectrofuge. Arden apparently was purchased by American Instruments Company (Aminco) and while it continued to perform pre-existing service contracts after the takeover, it is no longer bidding for new work. Beckman's monthly operations reports indicated that other than Aminco, the only two professional servicers of *Beckman* UCs in both the Atlanta and Silver Springs districts were the present parties.

77. Dr. Kahn, Professor of Biochemistry at North Carolina State University in Raleigh, testified that he had serviced his own UCs, including the installation of a new drive.

78. Dr. Cerutti testified that because the parts delay caused him to cancel the Spectrofuge

However, there is one other major source of service. Many large institutions employ in-house service personnel.[77] Moreover, some institutions do not provide for planned servicing with respect to all their instruments. Instead, they call upon the manufacturer or independent servicer only as needed.[78] Thus, viewed at the servicing level, independent service organizations compete for contract and call-by-call emergency work with manufacturers (who generally do not compete among themselves for such work) in a market where in-house service personnel provide the consumer with a reasonably interchangeable substitute.

In support of its position that there is no separate servicing market and no definable UC servicing submarket, Beckman called two experts, Dr. Alpert and Dr. Schachman, whose testimony can be readily summarized. The scientific instrument market comprises four main categories, the last of which has three subcategories:

contracts on his two liquid scintillation counters, and because Beckman servicing was so expensive, his counters are no longer covered by service contracts and he calls Beckman only in emergencies.

| Instrument Category | No. of Mfrs. | Major Mfrs. (other than Beckman) |
|---|---|---|
| (1) Process (control and maintain production processes) | 50-100 | |
| (2) Medical (patient-monitoring) | 100-200 | |
| (3) Environmental (measuring) | 200 | |
| (4) Laboratory | 500 | |
| a. Analytical (chemical R&D labs & academic labs). Examples: gas chromatographs, spectrophotometers. | | Perkin-Elmer, Gilford, Packard, Varian |
| b. Biomedical (medical research). Examples: ultracentrifuges, amino acid analyzers. | | Aminco, du Pont, Clifford, Laboratory Data Control |
| c. Clinical (diagnostic). Example: liquid scintillation counters. | | Bausch & Lomb, du Pont, Teknika, Instrumentation Laboratories, Perkin-Elmer |

Many of these manufacturers, including Beckman, sell instruments in several categories.

Instruments used for separation and for determination of molecular weight which can be substituted for the ultracentrifuge are chromatographs, electrophoresis systems, osmometers, and light scattering devices using lasers. For some applications these instruments perform better than UCs, for others not as well.

There are three manufacturers of analytical UCs with optical systems: Beckman, du Pont and Scientific Resources. Eight companies manufacture preparative UCs with rotation speeds over 40,000 rpm: Aminco, Beckman, Damon, du Pont/Sorvall, Electro-Nucleonics, Schaevitz Engineering, Scientific Resources, and Zena.

Dr. Alpert's conclusion that servicing of scientific instruments is not a separate definable market was based on several factors. Service is a principal consideration in the decision to purchase. The maintenance of a good service department is essential to a healthy rate of sales. Maintaining instruments in good working order adds to the company's reputation. Additionally, the line of communication between the customer and the manufacturer after delivery of the product is the service representative. Furthermore, because of the nature of the instruments involved, the capability of independent service organizations is limited. They are not informed of the constantly upgraded technology that the manufacturer generates and passes along to its service organization. These inherent limitations are responsible for the few independents which are confined to local areas. Additionally, servicing is not a profit center for the company. If it breaks even on servicing, it is fortunate. Even assuming that servicing is a separate market, however, the servicing of Beckman instruments is not a separate market because expertise in Beckman instruments is constantly being gener-

ated within the company. Finally, scientific instrument marketing takes place on a national basis. No instruments are sold only in a limited geographical area.

Spectrofuge called no experts. However, it introduced into evidence several exhibits, portions of which bear on the market definition question. First, Dawson's letter to Ballhaus of September 15, 1972, PX 23, reads in part:

> We [Spectrofuge] have been instrumental in customers actually changing orders, from competitors, to Beckman Instruments, the reason being that we are experts in B.I.I. products and can do much better service work on them, even though we have to service competitors' equipment that had been purchased before we became sole contractor, but the important thing is that customers want the kind of services that we are providing and since we can do our best on Beckman products, they are purchasing Beckmans.

A February 8, 1972 letter from Wilson (Beckman Staff Operations Manager) to all regional and district service managers (PX 130) asking for their ideas on sales enhancement states, "The ultimate objective of service is to increase sales. Our efforts should be directed to this end." In a similar vein, Dr. Popp (Union Carbide-Oak Ridge), wrote to Beckman on January 28, 1974 (PX 100) complaining about the delay in parts shipment, and stated, "[s]uch delays in the long run can only hurt your company's sales to those who purchase your products." A Beckman internal memo dated June 11, 1971 (PX 36) also connects service to sales:

> The specific question of our service response versus Packard on Liquid Scintil-

lation [at NIH] has been under considerable discussion recently. Our response time is generally within two days compared to Packard's four-hour response. The basic question is whether the additional expense of beefing up to this level would be offset by increased sales. Although Beckman has only 30 percent of the total LS units at NIH, over the past six months 50 percent of the new purchases have been Beckman units.

Finally, a March 14, 1972 memo from DePalma to Wilson (PX 83) regarding "Service Competition—Eastern Region" attaches a list of service competitors in the Philadelphia, Washington, Boston, and Mountainside districts, and states:

> I have purposely listed the competitors separately from this memo so that I may stress to you that entirely new concepts and philosophies should be adopted by Beckman in order to stay in the service business. Our accepted practice of hiring service people to repair our own instruments in an effort to protect present and future sales is at best short sighted. I think it is obvious by the attached list that there is interest in very prominent areas in the service business. BII should mature in its attitude toward service and provide service for service sake. Names like Bendix, GAF, Hoffman, LaRoche and Honeywell show us that we will not be able to hold on to what we have or what we think is proprietary. We are going to have to either grow and be competitive capability wise or subcontract service to one of the attached.

■ The evidence received with respect to cross-elasticity of supply[79] indicates that

---

**79.** Cross-elasticity of supply (sometimes called supply substitutability) looks at competition from the production end instead of the consumer end (cross-elasticity of demand, see note 75, *supra*). High cross-elasticities of supply and demand deter monopoly pricing. "A very high cross-elasticity of supply is a way of describing a condition in which the cost and rapidity of new entry are such that a monopolist of the product would have negligible power to increase its price above the competitive level. The increase would evoke a prompt and substantial increase in the output of the product,

as manufacturers of other products switched to production of his product." Posner, *Antitrust*, 441 (1974). Supply substitutability has been a significant factor in determining the relevant market in several cases. *United States v. Columbia Steel Co.*, 1948, 334 U.S. 495, 510–511, 68 S.Ct. 1107, 92 L.Ed. 1533; *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 5 Cir., 1976, 537 F.2d 1347, 1367–68; *United States v. Empire Gas Corp.*, 8 Cir., 1976, 537 F.2d 296, 303; *Telex Corp. v. International Business Mach. Corp.*, 10 Cir., 1975, 510 F.2d 894, 914–19; *Twin City Sportservice, Inc. v. Charles O. Fin-*

although 90% of its work involved servicing Beckman instruments, Spectrofuge did service the following non-Beckman instruments and UCs: Packard, Nuclear-Chicago, Perkin-Elmer, Cary, Instrumentation Laboratories, Unicam, Bausch & Lomb, Schoeffel, Coleman, Gilford, du Pont/Sorvall, IEC, Lord's and Zeiss. According to del Valle, Spectrofuge serviced these instruments because they were located in laboratories containing Beckman instruments which it was already servicing; non-Beckman instrument work was not the kind of business that Spectrofuge had been soliciting.[80] In addition to UCs, Spectrofuge serviced liquid scintillation counters, amino acid analyzers, spectrophotometers, sequencers, Dynograph medical recorders, radiochromatogram scanners, sample oxidizers, pH meters, and balances.[81]

Despite del Valle's testimony,[82] Spectrofuge's almost total confinement [83] to servicing Beckman equipment resulted not from lack of interest but lack of service capability. For example, Spectrofuge offered employment to various persons to achieve capability in Packard and Cary equipment (see the chart in text between notes 18 and 19, *supra*). In some cases, Spectrofuge could not bid on work because it had no one available and competent to service particular instruments in specific areas.[84] The Trial Court elicited the following admission from del Valle, which summarizes the reason for Spectrofuge's limited business: [85]

> THE COURT: Well, is it true or is it not true that in order for you to expand your business it is necessary for you to first find qualified men who can do the type of work you are engaged in?
>
> [del Valle]: Yes, sir.

Beckman asserts that, as a matter of law, the relevant product market cannot be confined to servicing only Beckman scientific instruments or Beckman UCs. In *United States v. du Pont & Co.*, 1956, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264, the Supreme Court stated:

> Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

\* \* \* \* \* \*

*ley & Co.*, 9 Cir., 1975, 512 F.2d 1264, 1271–74; *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 1 Cir., 1974, 508 F.2d 547, 552–53; *Science Prod. Co. v. Chevron Chem. Co.*, N.D.Ill., 1974, 384 F.Supp. 793, 798, 800. *Cf. Poster Exchange, Inc. v. National Screen Serv. Corp.*, 5 Cir., 1970, 431 F.2d 334, 339 (plaintiff cannot be required to convert nature of its business, make multimillion dollar investment and become a nationwide distributor just to survive in the geographic market). For an excellent student work which deals with this topic, see Note, *Telex v. IBM: Defining the Relevant Market*, 61 Iowa L.Rev. 184 (1975).

80. But see the letter quoted in text at note 8, *supra*.

81. This listing is taken from testimony and the Spectrofuge service contracts in evidence. The majority of the contracts list the instruments by model number—some of which are unfamiliar to us. Thus, this list may not be all-inclusive.

82. See text at note 80, *supra*.

83. See items 5 and 6 in statistical discussion, *infra*.

84. For example, Spectrofuge did not bid on the liquid scintillation counter work at NIH-Maryland because it had no one available for the job. Dawson was trained on these instruments but he did not want to move to Maryland. A second example was Spectrofuge's failure to seek Vanderbilt University contracts when Monday, the Beckman employee servicing that institution, declined Spectrofuge's job offer.

85. Spectrofuge was further limited to servicing only those Beckman instruments which came on the market prior to del Valle's and Dawson's departure from Beckman. Spectrofuge had no means to keep au courant on Beckman technology except through whatever literature Beckman furnished instrument owners. Moreover, Spectrofuge never bid on instruments which were covered by Beckman's first-year warranty.

[T]here are certain differences in the formulae for soft drinks but one can hardly say that each one is an illegal monopoly. Since *du Pont* it has generally been recognized that every manufacturer has a "natural" monopoly in the sale and distribution of his own products, especially when they are sold under a trademark (as Beckman's are). Such monopolies, without more, have been held not to violate the antitrust laws. *Bushie v. Stenocord Corp.,* 9 Cir., 1972, 460 F.2d 116, 120; *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.,* E.D.Pa., 1975, 403 F.Supp. 643, 651, *aff'd,* 3 Cir., 1977, 565 F.2d 154; *Allied Elec. Supply Co. v. Motorola, Inc.,* W.D.Pa., 1973, 369 F.Supp. 133, 138; *A–1 Business Mach. Co. v. Underwood Corp.,* E.D.Pa., 1963, 216 F.Supp. 36, 37.

Similarly, some courts in varying contexts have recognized that a vertically integrated manufacturer may initially have a "natural" monopoly over certain new products until other companies begin to compete with the manufacturer at one level of competitive activity. *Telex Corp. v. International Business Mach. Corp.,* 10 Cir., 1975, 510 F.2d 894, 899 (originally IBM, being the only manufacturer of peripheral products plug-compatible with its systems, had 100% of the IBM plug-compatible market); *Advance Business Sys. & Sup. Co. v. SCM Corp.,* D.Md., 1968, 287 F.Supp. 143, 150, 153, *modified on other grounds,* 4 Cir., 1969, 415 F.2d 55 (upon introduction of its copying machines, SCM enjoyed natural monopoly in the sale of paper for its machines). *Cf. United States v. Jerrold Elec. Corp.,* E.D.Pa., 1960, 187 F.Supp. 545, *aff'd per curiam,* 1961, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (compulsory service agreement reasonable in early developmental stage of community television antenna systems). As one commentator has pointed out, "[e]ven a firm that produces 100 per cent of the available supply may lack monopoly power: it may be the last survivor of a dying industry or the first-comer into a field that can be and will be entered with no difficulty by numerous others." Edwards, *Control of the Single Firm: Its Place in Antitrust Policy,* 30 Law & Contemporary Prob. 465, 466 (1965).

Several cases indicate that it is possible under certain prescribed circumstances to limit the relevant market to a single firm's products. *E. g., Eastman Kodak v. Southern Photo Materials Co.,* 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; *Poster Exchange, Inc. v. National Screen Serv. Corp.,* 5 Cir., 1970, 431 F.2d 334, 339; *Bushie, supra; Tire Sales Corp. v. Cities Serv. Oil Co.,* N.D.Ill., 1976, 410 F.Supp. 1222, 1230. Analysis of these cases reveals that such a limited market would be appropriate when, for example, the vertically integrated manufacturer uses his dominant position at one level of competitive activity to eliminate competition at another level, or when a firm's product has total market dominance as opposed to mere "brand" monopoly; that is, if the firm's product is so unique or so dominant in the market in which it competes that any action by the manufacturer to increase his control over that product virtually assures that competition in the market will be destroyed. The anticompetitive tool often used in the "leverage" cases involve refusals to deal. See *Cooper, supra,* 72 Mich.L.Rev. at 440–445.

In this regard, Spectrofuge relies heavily on the *Kodak* case. However, the question of monopoly power was not at issue in *Kodak* because an earlier judgment in the government's favor against Kodak was considered prima facie evidence of antitrust violations in the private suit. 273 U.S. at 369 n.3, 47 S.Ct. 400. Spectrofuge does not enjoy that advantage here.

■ The fact that a company limits its competitive activity to a single firm's products (and at only one competitive level) cannot control the definition of the relevant market. *Telex, supra,* 510 F.2d at 917. *But cf. Power Replacements Corp. v. Air Preheater Co.,* E.D.Pa., 1973, 356 F.Supp. 872, 896 (suggesting that market can be limited to that in which the plaintiff chose to compete). The *Telex* Court reasoned that limiting the relevant market to peripheral products plug-compatible with IBM equipment ignored *du Pont's* reasonable interchangeability standard (cross-elasticity of demand)

and the low cost involved for Telex in supplying peripheral products compatible with equipment manufactured by IBM's competitors (cross-elasticity of supply).

We believe that *Telex,* together with the cases cited in note 79, *supra,* raise very serious doubts as to whether the relevant market here could be confined as a matter of law to servicing Beckman instruments or Beckman UCs. As to the broader market asserted by plaintiff, there was no evidence as to Beckman's comparative strength in the scientific instrument market as a whole. As to the submarket, while Beckman obviously enjoys a dominant position in UC sales,[86] the evidence introduced by Beckman as to those instruments or systems which provide the customer with substitutes for UCs remained uncontradicted. There was no evidence regarding Beckman's strength if reasonably interchangeable substitutes for UCs were considered as part of the submarket.

Moreover, the possibility of defining so narrow a submarket must be weighed in light of the standards laid down by the Supreme Court in *Brown Shoe Co. v. United States,* 1962, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510:

> The boundaries of . . . a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

Of course, because this case involve services, *Brown Shoe* must be read in conjunction with *United States v. Grinnell Corp.,* 1966, 384 U.S. 563, 572–73, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778:

> [W]e deal with services, not with products; and . . . we conclude that the accredited central station is a type of service that makes up a relevant market and that domination or control of it makes out a monopoly of a "part" of trade or commerce within the meaning of

§ 2 of the Sherman Act. The defendants have not made out a case for fragmentizing the types of services into lesser units.

> Burglar alarm service is in a sense different from fire alarm service; from waterflow alarms; and so on. But it would be unrealistic on this record to break down the market into the various kinds of central station protective services that are available. Central station companies recognize that to compete effectively, they must offer all or nearly all types of service. The different forms of accredited central station service are provided from a single office and customers utilize different services in combination. . . . In our view the lumping together of various kinds of *services* makes for the appropriate market here . . .

(Emphasis in original; footnotes deleted.)

 Translating these cases to the facts here, there is nothing in the record to indicate that the industry or the public recognizes servicing of Beckman UCs as a separate economic entity. Del Valle, who was trained to service UCs in two hours before he began performing jobs on his own, went so far as to tell the Trial Judge (who admitted having little mechanical ability) that the Judge could be trained to service an ultracentrifuge. Tr. 1347–48. Indeed, Spectrofuge's position throughout has been that UC servicing was a fairly simple matter. Therefore, it cannot be said unique engineering talents (production facilities) are involved. See *Heatransfer, supra,* 553 F.2d at 980. Moreover, there is nothing in the record to indicate that UCs—as opposed to other instruments—were sold to distinct customers. As a matter of fact, the parties' customers had many different types of scientific instruments. Similarly, the evidence disclosed nothing about distinct pricing for UC servicing, as opposed to servicing other instruments. Under the *Grinnell* rationale, there is no basis for bifurcating a Beckman instrument servicing market into a submarket for servicing Beckman UCs.

---

**86.** See items 1 and 2 in statistical discussion, *infra.*

And the unique facts of this case present other fundamental problems. The record overwhelmingly establishes that Spectrofuge's business was limited—both with respect to product and geographic markets—because of its inability to hire employees from Beckman, Packard, or in one case, an institution. With apparently a small capital investment, and precious little devoted to inventory, Spectrofuge accomplished quick and easy entry into the servicing market. See *United States v. United Shoe Mach. Corp.,* D.Mass., 1953, 110 F.Supp. 295, *aff'd per curiam,* 1954, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910; *see also* Sullivan, *supra,* § 23, at 77. Indeed, the testimony of two customers (Kahler of Union Carbide and Fleming of North Carolina State University) suggests that prior Beckman employment was the determinative factor that enabled Spectrofuge to compete successfully on capability grounds (price was another primary factor).

The narrowly defined market urged by Spectrofuge thus would have to be viewed in the unique factual context presented, *e. g., du Pont, supra,* 351 U.S. at 395 n.22, 76 S.Ct. 994, namely, in a situation where (i) five of its employees (del Valle, Dawson, Autry, Farnham, and Jackson) were formerly employed by Beckman, whose products comprise the narrow market urged by the plaintiff, and their primary expertise lay quite naturally in servicing Beckman instruments; and (ii) Spectrofuge's expansion in terms of expertise and geography was directly if not primarily related to its ability to find and hire qualified personnel.

By analogy, suppose, for example, that two Xerox copier service representatives resigned and formed their own company, hired other Xerox service reps away from the company, began to compete for the same accounts they had previously serviced, were unable to hire certain Xerox reps in certain locations, and were able to hire no IBM copier service representatives, but in a few states managed to compete successfully with Xerox for service contracts and devoted around 80% of their time to servicing Xerox Model 5400. Could it be said that a Model 5400 servicing submarket existed?

We doubt it. But even assuming the market could be confined to servicing Beckman instruments or Beckman UCs, Spectrofuge failed to prove that Beckman enjoyed monopoly power in any possible geographical market. In terms of the kinds of statistics the legally tutored ordinarily look for in determining market shares, the record discloses the following: (1) Over 90% of the preparative UCs in use in laboratories in the United States are of Beckman manufacture. (2) Over 90% of the analytical UCs sold in the United States are of Beckman manufacture. (3) Beckman's total sales for 1973 and 1974 amounted to $161.5 million and $195.7 million, respectively.[87] (4) Beckman's UC sales (preparative and analytical) during 1970–1973 ranged between $5.27 and $5.95 million annually.[88] (5) In its fiscal year ending June 30, 1973, Beckman had between $225,000 and $255,000 in service contracts on Beckman instruments in the Atlanta district. (6) Over 90% of Spectrofuge's service work is done on Beckman instruments. (7) Of that 90%, 80–90% is devoted to servicing Beckman UCs. (8) Spectrofuge's first fiscal year (May 1972–April 1973) produced almost $50,000 in total sales from service contracts and its second produced just over $135,000. (9) When Beckman was served with plaintiff's interrogatories, Wilson asked Williams to summarize Spectrofuge's actual UC contract volume in the Atlanta district. Williams reported that Spectrofuge had about $70,000 worth of UC contracts; Beckman had about $85,000 on the same instruments.[89]

---

**87.** PX 314 and PX 315, Beckman 1973 and 1974 Annual Reports.

**88.** Interrogatory answers read to the jury included the breakdown in sales for preparatives and analyticals by year and first quarter 1973–74 figures were included in that answer.

**89.** It should be borne in mind that Spectrofuge charged 15–20% less on service contracts than did Beckman. Therefore, the more reliable data which the plaintiff could have introduced to show Beckman's monopoly power would have been the number of instruments under service contract—not the total contract volume. Moreover, we are a mite skeptical about

The reader may be as surprised as we were to learn—after a thorough review of the record—that the nine items just listed comprise the sum total of information placed before the jury from which it could determine statistically the parties' share in any market, broad or narrow.

In analyzing this information, in view of the major gaps discussed below, we fail to see what possible relevance items 1 to 4 have. Spectrofuge charged Beckman with monopolizing or attempting to monopolize servicing in a less-than-national geographic market—not the sale and marketing of scientific instruments or ultracentrifuges throughout the United States. Based on items 5 to 9, the jury could have deduced the following. In Spectrofuge's first fiscal year (May 2, 1972–April 30, 1973), it had $45,000 worth of contracts (90% of $50,000) on Beckman instruments, presumably in Florida, North Carolina, Tennessee and Maryland—the states in which Spectrofuge stipulated it did business. Beckman's nearest comparable fiscal year (July 1, 1972–June 30, 1973) produced between $225,000 and $255,000 in contracts on Beckman instruments in the Atlanta district which includes Florida, Georgia, North Carolina, South Carolina, Alabama, Tennessee and the northern half of Mississippi.[90]

However, with regard to the product market urged by Spectrofuge—servicing of Beckman instruments—the jury was not informed of: (1) the types of Beckman instruments included within the product market asserted; (2) the total number of Beckman instruments located in (a) the Atlanta district, (b) the Silver Springs district, or (c) the four states in which Spectrofuge did business; (3) the number of Beckman in-

struments sold and in use in any of the three geographical areas after May 2, 1972;[91] (4) the number of Beckman instruments serviced by Beckman in any of these three areas; (5) the number serviced by Spectrofuge; (6) the number serviced by in-house personnel; (7) the number not under any service contract but which are normally serviced; (8) the potential dollar volume in service contracts in any of the three geographic areas mentioned above; (9) the state-by-state dollar volume in contracts held by Beckman or Spectrofuge; or (10) comparable figures for each during the second fiscal year.

With regard to the submarket asserted by plaintiff—servicing of Beckman UCs—the only evidence given the jury from which it could determine Beckman's monopoly power is one figure: at some point after suit was filed Beckman had $85,000 in UC contracts as opposed to Spectrofuge's $70,000 in the Atlanta district. Excluding the number of UCs in that district which were serviced by in-house personnel or on a call-by-call (non-contract) basis, and assuming that this figure was reliable,[92] the most the jury could have concluded was that Beckman held a 54.83% share of the Beckman UC service market in the Atlanta district, and Spectrofuge held a 45.16% share.[93]

However, it is significant that the jury was not informed of the following relative to the submarket claimed: (1) the total number of UCs located in the Atlanta district or the number located in each state thereof; (2) the number of Beckman UCs in the Atlanta district which had been sold and were in use following May 2, 1972; (3) the number of Beckman UCs serviced by Beckman in this district or in each state

---

the reliability of Beckman's estimation of Spectrofuge's UC contract volume. However, these figures were given by Wilson in a deposition offered and read by plaintiff during its case-in-chief. Had they been far off the mark, we assume that Spectrofuge would not have presented this testimony.

**90.** There was no evidence to indicate that Spectrofuge ever bid on contracts in Georgia, South Carolina, Alabama, or Mississippi. It successfully sought damages for loss of future contracts in Alabama, but it is clear that Spectro-

fuge never bid on the work for which it sought recovery. The Trial Court—correctly we believe—granted a partial judgment n. o. v. with respect to that claim. See text at note 65 and notes 41 and 66, *supra*.

**91.** See note 85, *supra*.

**92.** See note 89, *supra*.

**93.** See note 94, *infra*.

thereof; (4) the number serviced by Spectrofuge, district or state; (5) the number serviced by in-house personnel, district or state; (6) the number not under service contract, district or state; (7) the potential dollar volume in UC service contracts in the Atlanta district; (8) the comparative dollar volume in UC service contracts held by Beckman and Spectrofuge in specific time frames and on a state-by-state basis.

Thus, apart from the question of whether, as a matter of law, a relevant market can be defined as narrowly as Spectrofuge urges, we hold that there was insufficient evidence to support the jury's implicit finding that Beckman monopolized or attempted to monopolize a market comprised of the servicing of Beckman's scientific instruments or the submarket comprised of servicing its ultracentrifuges. There was simply no evidence from which the jury could begin to measure Beckman's power to control prices or to exclude competition in the relevant market defined by Spectrofuge. *Aviation Specialties, Inc. v. United Technologies Corp.,* 5 Cir., 1978, 568 F.2d 1186, 1193; *Scranton Const. Co. v. Litton Indus. Leasing Corp.,* 5 Cir., 1974, 494 F.2d 778, 783; *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.,* 8 Cir., 1976, 531 F.2d 910, 918–19; *E. J. Delaney Corp. v. Bonne Bell, Inc.,* 10 Cir., 1975, 525 F.2d 296, 306–07; *Bushie v. Stenocord Corp.,* 9 Cir., 1972, 460 F.2d 116, 121; *Bernard Food Indus., Inc. v. Dietene Co.,* 7 Cir., 1969, 415 F.2d 1279, 1284. *See generally* Ames, *Evidentiary Aspects of Relevant Product Market Proof in Monopolization Cases,* 26 DePaul L.Rev. 530 (1977). And as to the attempt claim, there was nothing to show a dangerous probability of successfully monopolizing either market. Indeed, as to the attempted monopolization of a UC servicing submark-

et in the Atlanta district, what little evidence there was showed that Beckman had no possibility of success and that if viewed properly with respect to geographic market considerations, *see Otter Tail Power Co. v. United States,* 1973, 410 U.S. 366, 369 & n.1, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359, 363, Spectrofuge may well have enjoyed a superior position.[94]

Under these circumstances, the District Court should have granted Beckman's motion for a directed verdict and, failing that, should have entered judgment n. o. v. with respect to the § 2 claim.

### V. The Section 1 Claim

Section 1 of the Sherman Act, 15 U.S.C.A. § 1, forbids "[e]very contract, combination . . . , or conspiracy, in restraint of trade . . . ." Essential to every § 1 offense is concert of action between separate business entities. It is axiomatic that unilateral activity by a single firm cannot be reached via this section. *Scranton Const. Co. v. Litton Indus. Leasing Corp.,* 5 Cir., 1974, 494 F.2d 778, 783; *Weather Wise Co. v. Aeroquip Corp.,* 5 Cir., 1972, 468 F.2d 716, 718; *Cliff Food Stores, Inc. v. Kroger, Inc.,* 5 Cir., 1969, 417 F.2d 203, 206; *Six Twenty-Nine Prod., Inc. v. Rollins Telecasting, Inc.,* 5 Cir., 1966, 365 F.2d 478, 484; *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.,* 8 Cir., 1976, 531 F.2d 910, 916–17; *Polytechnic Data Corp. v. Xerox Corp.,* N.D.Ill., 1973, 362 F.Supp. 1, 8–9; *Kendall Elevator Co. v. LBC&W Assoc.,* D.S.C., 1972, 350 F.Supp. 75, 78; Boone, *Single-Corporation Competitive Torts and the Sherman Act,* 2 Ga.L. Rev. 372, 376 (1968) [hereinafter cited as Boone]; Stengel, *Intra-Enterprise Conspiracy Under Section 1 of the Sherman Act,* 35 Miss.L.J. 5 (1963) [hereinafter cited as Stengel].

---

**94.** One can only wonder how the 54.83% and 45.16% shares in UC service contracts held respectively by Beckman and Spectrofuge in the Atlanta district (again assuming the reliability of the contract volume figures) would have shifted had Beckman's figures been discounted by 15–20% and had figures been assembled on a state-by-state basis for North Carolina, Tennessee, and Florida—the only three states in that district in which Spectro-

fuge conducted or sought to conduct business. In other words, if the $85,000 volume figure for Beckman in the Atlanta District had been adjusted by subtracting 15–20% and excluding Beckman UC contracts in Georgia, South Carolina, Alabama, and Mississippi where Spectrofuge never bid for service work, Spectrofuge very well may have held in excess of 50% of the submarket in North Carolina, Tennessee, and Florida.

■ It is equally well settled that a corporation cannot agree, combine, or conspire with its officers or agents to supply the collaborative element of a § 1 offense. *E. g., Cliff Food Stores, supra; Morton Buildings, supra; Kendall Elevator, supra.* The Fifth Circuit applies the same rule to a corporation and its unincorporated divisions. *Cliff Food Stores, supra,* 417 F.2d at 206 and cases cited therein; *see Stengel, supra,* at 24–26.

■ Spectrofuge's amended complaint alleged that Beckman "has unlawfully contracted, combined, and conspired with, among others, its ultracentrifuge and/or 'Beckman instrument' customers to force" it out of business. The anticompetitive conduct cited by plaintiff to support this claim are Beckman's drive policy (failure to prorate below 1.2 billion revolutions unless the instrument was serviced by Beckman and disallowing Spectrofuge employees to install drives when they were qualified to do so and still receive full proration), its intentional delay in the shipment of parts, and the wrongful credit hold (main brief at 42–50).

As detailed in Part II of this opinion, the facts pertaining to the parts delays and the credit hold demonstrate beyond peradventure that—anticompetitive or not, reasonable or unreasonable,[95] intentional or unintentional—both courses of action were undertaken solely by Beckman. We cannot imagine more classic examples of unilateral conduct.

Spectrofuge has failed to articulate precisely how Beckman's proration policy involves a contract, combination, or conspiracy with Beckman instrument customers in restraint of trade. In one typical example, Spectrofuge argues:

Beckman does not challenge that you can have an illegal contract or combination in restraint of trade even if the Plaintiff is an unwilling participant. This would, of course, be equally true as to an illegal contract with customers of the antitrust law violator, Beckman. Beckman well knows that it could have been found guilty of an unlawful *contract* or *combination*—else you can be sure it would have raised this argument in its Brief. This law is too well settled to be even dealt with at length. See e. g. *U. S. v. Parke Davis,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495 [89 S.Ct. 1252, 22 L.Ed.2d 495] (1969); *Northern Pacific, supra; Advance Business Systems & Supply Co. v. SCM Corp.,* 415 F.2d 55 (5th Cir. 1969), *cert. denied,* 397 U.S. 920 [90 S.Ct. 928, 25 L.Ed.2d 101] (1970); *Simpson v. Union Oil Company of California,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); etc., etc. etc.

Main brief at 45.

*Parke, Davis* involved a situation in which the defendant used its refusal to deal with wholesalers to cut off the flow of its products to retailers, thereby inducing retailers' adherence to the defendant's sug-

---

**95.** With respect to parts delays, we point out in passing that Beckman's delays and parts policy (selling parts to non-contract customers only out of sales inventory, etc.) was much more reasonable than that of SCM held not to have violated the antitrust laws in *Advance Business Sys. & Sup. Co. v. SCM Corp.,* D.Md., 1968, 287 F.Supp. 143, 150 & n.13, 159, *modified on other grounds,* 4 Cir., 1969, 415 F.2d 55.

There is one Fifth Circuit case which suggests that retaliatory parts delays might have antitrust implications. *Dillon Materials Handling, Inc. v. Albion Indus.,* 5 Cir., 1978, 567 F.2d 1299, 1301 n.7. However, quite apart from lack of concerted action, the unrefuted evidence that Beckman itself experienced such delays, that Spectrofuge never stocked drives or maintained a substantial inventory, together with Beckman's track record on parts shipments set forth in Appendix B, which speaks for itself, could not support a finding of retaliatory action.

With respect to the credit hold, the Fifth Circuit has recently held that each defendant's independent belief that the plaintiff's credit standing was poor formed a legitimate basis for refusing to deal with him, regardless of his offer to pay in cash or by cashier's check, and thus was a defense to a charge of *concerted* refusal to deal. *Coughlin v. Capital Cement Co.,* 5 Cir., 1978, 571 F.2d 290, 300–301. *See also Cooper, supra,* 72 Mich.L.Rev. at 440.

gested retail price.[96] *Simpson Oil* dealt with a consignment agreement and resale price maintenance. The other cases cited by Spectrofuge involved tying arrangements.[97] These decisions are totally irrelevant.

We have combed the Beckman service contracts in evidence and there is not one word in them relating to the drive proration policy.[98] And the record is totally barren of any contract, combination, or agreement, express or implied, between Beckman and Beckman instrument owners to—as the plaintiff would have it—"put Spectrofuge out of business."[99] These policies were established unilaterally, and even with Procrustean efforts, there is no way to connect them with Beckman instrument or UC customers within the meaning of § 1.

In *Polytechnic Data Corp. v. Xerox Corp.,* N.D.Ill., 1973, 362 F.Supp. 1, the plaintiff manufactured and marketed a device for controlling and measuring the work performed by copying machines. Polytechnic challenged under § 1 Xerox's announced policy with respect to the attachment of third party accessories to its machines which involved three conditions: (1) the accessory had to be tested by Underwriter's Laboratories, Inc., in combination with the copying machine, and be recognized as safe; (2) the accessory could not damage the copying machine; and (3) the attachment could not interfere with the normal operation and servicing of the machine.

The District Court held that these restrictions did not constitute a per se § 1 restraint and that they were reasonable conditions premised on legitimate business interests designed to protect property and its users and to promote safety. *Id.* at 6. The Court's discussion of the concerted activity requirement is well worth reporting at some length and is dispositive of Spectrofuge's drive policy contentions:

> . . . There is no allegation that Xerox engaged the co-operation of any of its lessees to compel other lessees to abide by the Xerox policy; nor is there any allegation that any of the lessees joined together to compel other lessees to abide by the policy. All actions taken were by Xerox. Indeed, there would be no logical reason

**96.** For further discussion of *Parke, Davis,* see footnote 9 in the quotation from the *Polytechnic* case, *infra.*

**97.** As pointed out in note 35, *supra,* the District Court directed a verdict on Spectrofuge's illegal tying claim, and Spectrofuge has not appealed from that ruling—and with good cause. There was absolutely no requirement imposed by Beckman that a customer had to employ its services, and Beckman parts were available to anyone, irrespective of who serviced the instruments. Nevertheless, Spectrofuge persists, for reasons we cannot fathom, in characterizing Beckman's proration and drive policy as a "classic illegal tying-arrangement" (main brief at 50), and in relying on tying cases.

**98.** The Beckman rotor warranty was voided if a non-Beckman drive was installed in a Beckman UC. In view of the potential hazards a rotor explosion presented, this policy was perfectly reasonable. *See Weather Wise, supra; Kendall Elevator, supra; Tripoli Co. v. Wella Corp.,* 3 Cir., 1970, 425 F.2d 932 (absolute restrictions as to whom products could be sold held reasonable in view of potential dangerousness of hair product). It was also reasonable for Beckman to impose the conditions it did with respect to proration below 1.2 billion revolutions. Not all of Spectrofuge's service representatives were former Beckman employees and Beckman had no assurance of their qualifications. Moreover, Spectrofuge's employees had no means of keeping abreast of Beckman's new developments. In this connection it is significant that a Spectrofuge service representative was always present when Beckman installed a drive for a Spectrofuge customer because Spectrofuge would be responsible for servicing the UC thereafter. But even despite Beckman's policy, anyone was free to install a non-Beckman drive. The only reason for not doing so was the potential financial risk to the instrument owner if the drive malfunctioned and damaged the rotor.

**99.** Plaintiff's trial tactic was to reiterate, time and time again, DePalma's threat to del Valle (quoted in text, *supra,* in Part II) that Beckman would put Spectrofuge out of business. Plaintiff resorted to the same tactic on appeal. That threat, in one version or another, is quoted or referred to at least fourteen times in two briefs. But such a threat, while certainly critical to specific intent, does not substitute for solid evidence to satisfy the other requisite elements of Sherman Act violations. For a case where a similar threat was made without carrying the day for the plaintiff, see the *Whitten* case, *supra,* 508 F.2d at 559.

for the Xerox lessees to join together, either with Xerox or themselves, to enforce Xerox's own policy particularly if plaintiff's allegation about the efficacy of its device is well founded. The alleged mere acquiescence by certain individual Xerox lessees in the unilateral policy of Xerox does not give rise to an illegal combination.[9]

[9] This was implicitly recognized by the Supreme Court in *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) when it found that the acquiescing dealers were informed that if they complied with price maintenance programs, their principal competitors would also do so and that all would benefit by uniform adherence to the program. However, the Supreme Court made it clear that had the dealers individually acquiesced in the policy solely because of their desire to remain a dealer, there would have been no combination (Id. at 45, 80 S.Ct. 503). In other words, it was not merely individual desire to remain a dealer that caused the dealers to adhere to the program, it was the collective desire of the acquiescing dealers to make the program a success (in which case they would all benefit by absence of price competition among each other) which, together with the positive efforts of several wholesalers to carry off the program, supplied the collaborative element required by Section 1.

The absence of any potential gain on the part of Xerox lessees if the use of Polytechnic's device were prevented is fatal to Polytechnic's claim of combination.

It is not sufficient to merely allege acquiescence and thus claim a combination has been demonstrated. The finding of an illegal combination has traditionally been based upon the fact that the third parties benefitted from their acquiescence.[10] There could be no benefit to the

[10] The absence of potential benefit to third parties precludes a finding of combination or conspiracy. See *Advance Business Systems &*

Supply Co. v. SCM Corp.*, 287 F.Supp. 143 (D.Md.1968), aff'd 415 F.2d 55 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

lessee of Xerox from acquiescence since, if Polytechnic is correct in its assertions, these lessees could only benefit by installing Polytechnic equipment.

It is clear that the actions of Xerox were not pursuant to an illegal combination or conspiracy between Xerox and its lessees. The Xerox policy was apparently adopted as an independent business decision without consultation or collaboration with its lessees who, in fact, are neither competitors of Polytechnic, Xerox, nor necessarily competitors of each other. In fact, Xerox's lessees are putative consumers of Polytechnic devisees. Under these circumstances, plaintiff's claim of combination must fail. There is neither a legal basis nor substantial evidence to support plaintiff's claim of unlawful concert of action.

*Id.* at 8–9. We ask what gain Beckman instrument customers would derive from driving from the market an independent service organization that offered its services at a cost 15–20% below that of Beckman service? The answer is clearly, "none."

While Beckman may be guilty of unilaterally enforcing its pre-existing proration policy in response to Spectrofuge's competitive inroads into its servicing business,[100] such enforcement was at best a garden variety business tort not cognizable under § 1, at best a private, as opposed to a public, wrong reachable under state law. *See George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 1 Cir., 1974, 508 F.2d 547, 560, quoting *Vogue Inst. Corp. v. Lem Inst.*

**100.** As discussed in note 34, *supra,* Spectrofuge was not the sole target of this enforcement. However, Spectrofuge proved that Beckman prorated for the NIH in Bethesda whose in-house personnel serviced its equipment. On the other hand, Beckman proved that NIH was a rather unique customer. It owned approximately 10,000 scientific instruments, of which about 500–600 were of Beckman manufacture. The Beckman-NIH contract, PX 231, required Beckman to supply annually 670 man hours of training by a senior field service engineer to

NIH service personnel and scientists. Beckman employed on the premises a full-time account supervisor who had control of the Beckman contracts and all personnel necessary to fulfill the commitment. On the average, six Beckman service representatives visited NIH each day, but that number could vary between three and ten, depending on work load.

It should be borne in mind that this is the contract which, according to del Valle, Spectrofuge did not bid on because of Beckman's drive policy. See note 41, *supra*.

*Corp.,* S.D.N.Y., 1966, 40 F.R.D. 497, 499 (Frankel, J.); *Boone, supra.* As Judge Gee pithily remarked in *Scranton Construction, supra,* the Sherman Act is not "a panacea for all business affronts which seem to fit nowhere else." 494 F.2d at 783.

Since the defendant's conduct involved only unilateral activity, the § 1 claim should not have been submitted to the jury, and it was error to deny Beckman's JNOV motion.

### VI. Inter Alia

 Despite evidence that Spectrofuge's own conduct contributed to the institution and continuation of the credit hold, we believe there was sufficient evidence, particularly that relating to Beckman employees' almost cheerful announcement of Spectrofuge's credit woes, to present a jury question on plaintiff's unfair competition count. We therefore affirm the final judgment as it relates to the common law claim.

 Spectrofuge was awarded $25,000 in attorneys' fees and we have now held it proved no antitrust violations. Ordinarily, we would be inclined to remand to the District Court the evaluation of the fee award in light of *Johnson v. Georgia High-*way *Express, Inc.,* 5 Cir., 1974, 488 F.2d 714, 717–19. However, because the plaintiff was ultimately unsuccessful and because of our conviction that the antitrust claim bordered on the frivolous—although it has taken these endless pages to demonstrate it— (see *Johnson* factor 10, *id.* at 719, the "undesirability" of the case), we feel fully justified in sparing everyone involved further wasted time and effort on a case which should never have been brought in federal court in the first instance.[101] Therefore, we reverse the attorneys' fee award.

Beckman asserts that the trial court erred in not granting its motion for a new trial on the counterclaim for unfair competition and § 1 violations (pirating employees and misappropriation of confidential information). Suffice it to say that the District Court did not abuse its discretion in denying this motion. *E. g., Sulmeyer v. Coca Cola Co.,* 5 Cir., 1975, 515 F.2d 835, 852.

Our previous holdings dispose of the other issues raised by the parties.

### AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Appendices to follow.

---

**101.** If three parts delays, unilateral pricing policies, and three-week credit holds were the stuff of which antitrust violations were made, federal courts would undoubtedly have little time left for more pressing problems.

After completing our review of the record, it was clear that the opinion could be confined to approximately five pages. However, *Boeing* requires a more complete treatment. In addition, considering the time and resources already consumed on this meritless matter, we hoped at the very least that it could ultimately serve some useful purpose to the bench and the antitrust bar, especially to those lawyers who bring appeals to the Fifth Circuit. Ergo, a long, long opinion.

APPENDIX A

SUMMARY OF PLAINTIFF'S EXHIBITS 166–230

| Call Date | Exh. No. | Invoice No. | Univ. | Type of Machine | Drive Actual Charge | Drive Prorated Charge | Drive Differential | Labor | Travel | Total Differential |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/11/72 | 166 | 437336 | VA MIA | L | 223.50 (743M) | 223.50 | 0 | 30.00 | 20.00 | 50.00 |
| 9/12/72 | 167 | 437338 | EPA MIA | L2–50 | 292.50 (973M) | 292.50 | 0 | 30.00 | 20.00 | 50.00 |
| 9/21/72 | 168 | 438408 | UF | L2–65B | 477.00 (198B) | 477.00 | 0 | 30.00 | 20.00 | 50.00 |
| 11/10/72 | 169 | 438500 | UF | L2–65B | Unknown (1.23B) | Unknown | 0 | 30.00 | 20.00 | 50.00 |
| 12/22/72 | 170 | 438853 | UF | L | 480.00 (2.5B) | 480.00 | 0 | 30.00 | 20.00 | 50.00 |
| 3/2/73 | 171 | 477860 | UF | L | 381.00 (1.41B) | 381.00 | 0 | 30.00 | 20.00 | 50.00 |
| 3/14/73 | 172 | 478065 | UNC | L3–40 | Unknown (9.5B) | Unknown | 0 | 20.00 | 20.00 | 40.00 |
| 4/13/73 | 173 | 439758 | Duke | L | 480.00 (2.6B) | 480.00 | 0 | 40.00 | 10.00 | 50.00 |
| 4/17/73 | 174 | 439578 | NCSU | L2–50 | 342.00 (1.14B) | 342.00 | 0 | 20.00 | 20.00 | 40.00 |
| 4/23/73 | 175 | 438262 | UCOR | L2–50 | 382.00 (1.41B) | 382.00 | 0 | 40.00 | 40.00 | 80.00 |
| 4/23/73 | 176 | 438263 | UCOR | L2–50 | 213.00 (708M) | 213.00 | 0 | 40.00 | 40.00 | 80.00 |
| 5/10/73 | 177 | 477077 | UCOR | L2–65 | 540.00 (5.4B) | 540.00 | 0 | 250.00 | 100.00 | 350.00 |
| 5/14/73 | 178 | 506282 | UNC | L2–65B | 437.25 (1.714B) | 437.25 | 0 | 50.00 | 25.00 | 75.00 |
| 5/21/73 | 179 | 477029 | UF | L3–50 | 480.00 (4.6B) | 480.00 | 0 | 50.00 | 25.00 | 75.00 |
| 5/30/73 | 180 | 506294 | UNC | L2–50 | 480.00 (1.509B) | 391.00 | 89.00 | 37.50 | 25.00 | 151.50 |
| 6/7/73 | 181 | 477098 | UCOR | L2–50 | 480.00 (4.9B) | 480.00 | 0 | 50.00 | 62.50 | 112.50 |
| 6/7/73 | 182 | 477099 | UCOR | L2–65B | 371.25 (1.27B) | 371.25 | 0 | 75.00 | 62.50 | 137.50 |
| 6/29/73 | 183 | 505909 | NCSU | L2–65B | 540.00 (2.6B) | 540.00 | 0 | 37.50 | 25.00 | 62.50 |
| 7/6/73 | 184 | 505921 | VA Durham | L | 480.00 (2.4B) | 480.00 | 0 | 25.00 | 12.50 | 37.50 |
| 7/24/73 | 185 | 476192 | VA Durham | L | 360.00 (2.751M) | 0 | 360.00 | 50.00 | 12.50 | 422.50 |
| 8/21/73 | 186 | 506201 | VA Durham | L2–50 | 433.00 (1.928B) | 433.00 | 0 | 37.50 | 12.50 | 50.00 |
| 8/28/73 | 187 | 477069 | U MIA | L2–50 | 480.00 (1.623B) | 403.00 | 77.00 * | 37.50 * | 25.00 * | 139.50 * |
| 9/4/73 | 188 | 506152 | VA Durham | L2–50 | 0 (643K) | 0 | 0 | 0 | 0 | 0 |
| 9/7/73 | 189 | 506917 | U MIA | L2–50 | 480.00 (5.16B) | 480.00 | 0 | 100.00 | 50.00 | 150.00 |
| 9/24/73 | 190 | 506199 | NCSU | L2–65B | 360.00 (39M) | 0 | 360.00 | 50.00 | 25.00 | 435.00 |
| 9/26/73 | 191 | 516820 | UCMD | L | 480.00 (2.8B) | 480.00 | 0 | 112.50 | 50.00 | 162.50 |
| 10/12/73 | 192 | 504868 | VA Durham | L2–50 | 360.00 (571M) | 172.50 | 187.50 * | 12.50 | 12.50 | 250.00 |
| 10/15/73 | 193 | 502075 | UCMD | L | 360.00 (54M/3.8M) | 0 | 360.00 | 100.00 | 50.00 | 510.00 |
| 10/19/73 | 194 | 504926 | VA Durham | L2–50 | 0 (84M) | 0 | 0 | 0 | 0 | 0 |
| 10/26/73 | 195 | 504936 | UNC | L2–65B | 540.00 (5.28B) | 540.00 | 0 | 75.00 | 25.00 | 100.00 |
| 10/31/73 | 196 | 504941 | UNC | L3–50 | 480.00 (8.0B) | 480.00 | 0 | 62.50 | 25.00 | 87.50 |
| 11/8/73 | 197 | 477249 | UCOR | L | 480.00 (unknown) | 480.00 | 0 | 50.00 | 100.00 | 150.00 |
| 11/12/73 | 198 | 504768 | VA Durham | L2–50. | 360.00 (320M) | 96.00 | 0 | 75.00 | 12.50 | 87.50 |
| 11/30/73 | 199 | 504987 | UNC | L2–65B | 360.00 (134M) | 40.20 | 319.80 | 75.00 | 25.00 | 419.80 |

* Reimbursed by Customer

EXHIBIT 73-230h

IDENT- 19

EVID- 1975 Motion ☐

Trial ☒

SPECTROFUGE, et al.

VS. BECKMAN

CASE NO. 73-1437-CIV-W-M

JOSEPH I. COGART, CLERK
U.S. DIST. CT.— SO. DIST./FLA

By...........

| Call Date | Exh. No. | Invoice No. | Univ. | Type of Machine | Drive Actual Charge | Drive Prorated Charge | Drive Differential | Labor | Travel | Total Differential |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/19/73 | 200 | 475727 | UCOR | L2-50 | 468.00 (2.28B) | 468.00 | 0 | 50.00 | 37.50 | 87.50 |
| 12/19/73 | 201 | 475726 | UCOR | L2-65B | 412.50 (1.54B) | 412.50 | 0 | 50.00 | 37.50 | 87.50 |
| 1/2/74 | 202 | 476037 | UNC | L3-50 | 360.00 (819M) | 246.00 | 114.00 | 62.50 | 25.00 | 201.50 |
| 1/16/74 | 203 | 476048 | VA Durham | L | 360.00 (543M) | 163.50 | 196.50 * | 75.00 | 12.50 | 284.00 |
| 2/21/74 | 204 | 562343 | UNC | L2-50 | 392.00 (1.5B) | 392.00 | 0 | 62.50 | 25.00 | 87.50 |
| 2/5/74 | 205 | 477293 | UCOR | L2-65B | 540.00 (3.4B) | 540.00 | 0 | 150.00 | 50.00 | 200.00 |
| 2/7/74 | 206 | 562318 | VA Durham | L | 360.00 (317M) | 96.00 | 264.00 * | 50.00 | 12.50 | 326.50 |
| 3/12/74 | 207 | 475899 | VA Durham | L3-50 | 428.00 (1.88B) | 428.00 | 0 | 25.00 | 12.50 | 37.50 |
| 3/18/74 | 208 | 475834 | UCOR | L3-50 | 480.00 (5.6B) | 480.00 | 0 | 50.00 * | 50.00 * | 100.00 * |
| 3/18/74 | 209 | 475835 | UCOR | L | 480.00 (4.15B) | 480.00 | 0 | 50.00 | 25.00 | 75.00 |
| 3/18/74 | 210 | 475836 | UCOR | L | 480.00 (unknown) | 480.00 | 0 | 50.00 | 25.00 | 75.00 |
| 3/19/74 | 211 | 475837 | UCOR | L2-65 | 540.00 (3.7B) | 540.00 | 0 | 50.00 | 50.00 | 100.00 |
| 3/19/74 | 212 | 475838 | UCOR | E | 474.00 (2B.+) | 474.00 | 0 | 62.50 | 50.00 | 112.50 |
| 4/1/74 | 213 | 475949 | UF | L2-50 | 480.00 (2.7B) | 480.00 | 0 | 37.50 | 25.00 | 62.50 |
| 5/3/74 | 214 | 546889 | Duke | L3-50 | 480.00 (6.1B) | 480.00 | 0 | 50.00 | 12.50 | 62.50 |
| 5/15/74 | 214A | 588839 | UF | L2-50 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5/21/74 | 215 | 588917 | UCOR | L2-65B | 540.00 (7.5B) | 540.00 | 0 | 56.00 | 126.00 | 182.00 |
| 5/21/74 | 216 | 621811 | UCOR | L2-50 | 480.00 (4.9B) | 480.00 | 0 | 56.00 | 112.00 | 168.00 |
| 5/24/74 | 217 | 505331 | Duke | L | 360.00 (619M) | 186.00 | 174.00 * | 56.00 | 14.00 | 244.00 |
| 6/20/74 | 218 | 588860 | UF | L2-65B | 540.00 (9.89B) | 540.00 | 0 | 42.00 | 28.00 | 70.00 |
| 8/2/74 | 219 | 622105 | UM | L2-50 | 301.50 (1.005B) | 225.29 | 76.21 * | 56.00 | 28.00 | 160.21 |
| 8/5/74 | 220 | 622175 | UT | L | 480.00 (7.4B) | 480.00 | 0 | 28.00 | 0 | 28.00 |
| 10/17/74 | 221 | 595212.1 | Duke | L3-40 | 560.00 (5.9B) | 560.00 | 0 | 60.00 | 15.00 | 75.00 |
| 11/3/74 | 222 | 595223 | Duke | L3-50 | 420.00 (718M) | 133.58 | 286.42 | 105.00 | 15.00 | 406.42 |
| 11/22/74 | 223 | 622433 | Duke | L3-50 | 420.00 (1.26B) | 234.38 | 185.62 | 45.00 | 15.00 | 245.62 |
| 11/27/74 | 224 | 590735 | UF | L2-50 | 420.00 (422M) | 94.53 | 325.47 | 45.00 | 30.00 | 400.47 |
| 11/27/74 | 225 | 622263 | UT | L | 560.00 (no FSR) | Unknown | 0 | 30.00 | 60.00 | 90.00 |
| 12/12/74 | 226 | 660380 | NCSU | E | 373.75 (1.409B) | 373.75 | 0 | 60.00 | 45.00 | 105.00 |
| 12/12/74 | 227 | 660881 | UNC | E | 300.00 (1.066B) | 266.25 | 33.75 | 90.00 | 30.00 | 153.75 |
| 12/18/74 | 228 | 650777 | VA MIA | L | 549.00 (unknown) | 549.00 | 0 | 75.00 | 45.00 | 120.00 |
| 12/18/74 | 229 | 660387 | Duke | L | 420.00 (1.194B) | 267.50 | 152.50 | 45.00 | 15.00 | 212.50 |
| 12/23/74 | 230 | 660392 | UNC | L3-50 | 560.00 (7.4B) | 560.00 | 0 | 30.00 | 45.00 | 75.00 |

* Reimbursed by Customer

# APPENDIX B

(Taken from DX 173A-173XX)

| DX 173- | Date Ordered | No. of Parts Ordered | Shipping Instructions (where shown) | Date Shipped | Delay (in days) | Other Comments |
|---------|--------------|----------------------|-------------------------------------|--------------|-----------------|----------------|
| A | 5/1/72 | 2 | Best way | Unknown | Unknown | Ordered from EID in Illinois. No invoice in exhibit from which to determine shipping date. |
| | 5/1/72 | 5 | Best way | 5/23 (3 pts.) 6/28 (2 pts.) 7/21 (1 pt.) | 22 58 81 | Ordered 2 of Part 576430; one shipped on 6/28; the second shipped on 7/21. |
| B | 7/7/72 | 1 | Emergency | 7/10 | 3 | |
| C | 7/17/72 | 1 | Emergency | 7/20 | 3 | |
| D | 9/6/72 | 2 | Best way | 9/13 | 7 | |
| E | 9/8/72 | 4 | Best way | 9/25 (3 pts.) Unknown (1 pt.) | 17 Unknown | Part shipped from location other than Fullerton. |
| F | 9/13/72 | 2 | Emergency | 9/14 | 1 | |
| G | 9/19/72 | 4 | Emergency | 9/22 | 3 | |
| H | 9/27/72 | 1 | Rush | 9/27 | 0 | |
| I | 10/9/72 | 1 | Emergency | 10/10 | 1 | |

| DX 173- | Date Ordered | No. of Parts Ordered | Shipping Instructions (where shown) | Date Shipped | Delay (in days) | Other Comments |
|---------|--------------|----------------------|-------------------------------------|--------------|-----------------|----------------|
| J | 10/10/72 | 2 | Emergency | 10/11 (1 pt.) 10/13 (1 pt.) | 1 3 | Shipped from Fullerton. Shipped out of service [Atlanta]. |
| K | 10/17/72 | 1 | Emergency | 10/18 | 1 | |
| L | 11/10/72 | 2 | Emergency | 11/14 | 4 | Both returned to Beckman. |
| M | 11/13/72 | 4 | Rush | 11/16 | 3 | |
| N | 11/16/72 | 1 | Emergency | 11/21 | 5 | |
| O | 11/21/72 | 1 | Best way | 12/13 | 22 | |
| P | 11/21/72 | 4 | Emergency | 11/27 (3 pts.) 12/15 (1 pt.) | 6 24 | 3 parts returned to Beckman; customer could not use. |
| Q | 11/27/72 | 1 | Emergency | 11/28 | 1 | Shipped from Mountainside. |
| R | 11/27/72 | 2 | Best way | 1/22/73 | 56 | Shipped from Fullerton. |
| | 12/5/72 | | Emergency | 12/20 | 15 | Ordered to replace faulty material. Telex indicates Fullerton was out of stock. |
| S | 1/11/73 | 16 | Rush | 3/29 (1 pt.) Unknown (15 pts.) | 76 Unknown | No invoice in exhibit from which to determine shipping date for other 15 parts. |

| DX 173- | Date Ordered | No. of Parts Ordered | Shipping Instructions (where shown) | Date Shipped | Delay (in days) | Other Comments |
|---|---|---|---|---|---|---|
| T | 2/6/73 | 1 | Best way | 2/13 | 7 | |
| U | 2/27/73 | 1 | Rush | 3/5 | 5 | |
| V | 3/14/73 | 1 | Rush | 3/21 | 7 | |
| W | 4/13/73 | 4 | Best way | 4/23 | 10 | |
| X | 4/25/73 | 2 | Rush | 4/30 | 5 | |
| Y | 5/8/73 | 1 | Emergency | 5/9 | 1 | |
| Z | 5/8/73 | 1 | ASAP | 5/10 | 2 | |
| AA | 5/9/73 | 3 | Rush | 6/6 (2 pts.) 6/27 (1 pt.) | 28 / 49 | Fullerton telexed Atlanta on 5/14 that 2 pts. scheduled to be shipped on 5/31; one part on 6/29. |
| BB | 5/24/73 | 2 | Emergency | 5/25 | 1 | |
| CC | 5/31/73 | 1 | Rush | 6/14 | 14 | |
| DD | 6/11/73 | 1) 2) | ASAP | 8/7 / 10/11 | 57 / 122 | Union Carbide--Dr. Popp. Circuit breaker. Damper assemblies. |
| EE | 6/15/73 | 5 | ASAP | 7/30 | 45 | |
| FF | 6/15/73 | 1 | Ship via air parcel post | 7/12 | 27 | |

| DX 173- | Date Ordered | No. of Parts Ordered | Shipping Instructions (where shown) | Date Shipped | Delay (in days) | Other Comments |
|---|---|---|---|---|---|---|
| GG | 7/3/73 | 1 | Best way | 9/6 | 65 | Board needed for Dr. Cerutti's instrument. |
| HH | 7/11/73 | 4 | ASAP | 7/17 | 6 | |
| II | 7/25/73 | 1 | ASAP | 8/22 | 28 | |
| JJ | 8/24/73 | 2 | Ship via air parcel post | 9/18 | 25 | |
| KK | 8/30/73 | 4 | Air mail | 9/13 | 14 | |
| | 8/30/73 | 1 | Air mail | 10/16 | 47 | |
| LL | 10/19/73 | 1 | ASAP Best way | 11/30 | 42 | Ordered to replace faulty material. |
| MM | 11/27/73 | 1 | Rush | 12/5 | 8 | |
| NN | 1/21/74 | 1 | Best way | unknown | At least 57 | Order acknowledgement estimated shipment date as 2/15; 3/19/74 Telex estimated shipping date as week of 3/25; no invoice in exhibit from which to determine shipping date. |
| OO | 4/15/74 | 1 | Emergency | 7/12 | 88 | Part #869796 ordered; Part #580327 shipped. |
| PP | 5/16/74 | 1 | ASAP Best way | unknown | At least 68 | Order acknowledgement estimated shipping date as 8/15/74. Telex inquiry sent 7/23. |

| DX 173- | Date Ordered | No. of Parts Ordered | Shipping Instructions (where shown) | Date Shipped | Delay (in days) | Other Comments |
|---|---|---|---|---|---|---|
| QQ | 8/16/74 | 2 | | 8/20 | 4 | |
| RR | 9/16/74 | 3 | Needed in 20-30 days | 10/2 | 16 | |
| SS | 10/16/74 | 1 | Needed in 20-30 days | 10/21 | 5 | |
| TT | 10/28/74 | 1 | Rush | 10/30 | 2 | |
| UU | 11/6/74 | 2 | Needed in 20-30 days | 11/19 | 13 | |
| VV | 10/28/74 | 9 | Needed in 30-60 days | 11/22 (6 pts.) unknown (3 pts.) | 25 | Invoice includes only 6 of the 9 parts ordered. |
| WW | 7/16/74 | 1 | | 7/25 | 9 | |
| XX | 7/8/74 | 1 | ASAP Best way | 7/16 | 8 | |